# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CRYSTAL ROBINSON, RICHARD SCHELLHAMMER, WILLIAM BRADEN, EARL KLADKE, JOSEPH PALOPOLI, JR., LANA SAVAGE, APRIL BRADLEY, JOHN TODA, MAXINE GLENN, NICOLE BLANCHARD, GLADYS TUBBS, TONYA GRUCHACZ, ROBERT TYSON, KATRINA HOWARD, SHEILA CAUTHEN, MARIANO LORENZO MACAISA, GINI MICHELLE COX, KENDRA PIAZZA, DAVID CONROE, and individually and on behalf of all others similarly situated, | Civil Action No. _____  CLASS ACTION COMPLAINT  JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

Plaintiffs Crystal Robinson, Richard Schellhammer, William Braden, Earl Kladke, Joseph Palopoli, Jr., Lana Savage, April Bradley, John Toda, Maxine Glenn, Nicole Blanchard, Gladys Tubbs, Tonya Gruchacz, Robert Tyson, Katrina Howard, Sheila Cauthen, Mariano Lorenzo Macaisa, Gini Michelle Cox, Kendra Piazza, and David Conroe ("Plaintiffs"), for themselves and on behalf of all others similarly situated, bring this action against General Motors LLC ("General Motors," "GM," or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## NATURE OF THE ACTION

1.     For years, GM has concealed a dangerous defect from its customers who purchased or leased 2013 to 2017 Cadillac ATS, SRX and XTS vehicles and 2014 to 2017 Cadillac CTS,

ELR and Escalade vehicles equipped with GM's "Cadillac User Experience" touch screen display (the "CUE System" or "CUE") (collectively, "Class Vehicles"). Among other things, the CUE System controls the vehicle's climate, navigation, audio/Bluetooth/communications, and back-up camera. GM's conduct is especially egregious because the defective CUE Systems pose serious safety risks.

2.      Accordingly, this action arises from Defendant's failure, despite its longstanding knowledge of the Defect, to disclose to Plaintiffs and other similarly situated customers that the Class Vehicles have defective CUE Systems that do not function in a safe and reliable manner.

3.      As alleged in greater detail below, the Class Vehicles were sold with defective CUE Systems. Specifically, the CUE System possesses an innate and serious safety defect (the "Defect") that causes it to spontaneously delaminate, bubble or crack in a "spider-web" formation. When this happens, the unit ceases to function properly and is rendered useless.



Defective CUE Screen

4.      This Defect, which manifests itself within the limited warranty period or shortly after the limited warranty period expires, poses a serious safety risk to drivers, who can become dangerously distracted.

5.      For all Class Vehicles, GM provided an express warranty: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because

the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty.

6.     Although GM has known about the Defect for years, instead of fixing it, GM has continued to sell new Cadillac vehicles with the Defect to customers, failing to disclose it. GM has forced its customers to spend $1,500.00 or more to replace the CUE once the Defect fully manifests. Moreover, when Class Members bring their vehicles to GM's authorized dealers for repair, the defective CUE Systems or components are replaced with the same defective parts, ensuring that the defective replacement CUE will eventually suffer the same delamination and spider-webbing issues.

7.     The Defect is inherent in the CUE Systems and is present at the time of sale. Because the Defect is inherent in every CUE System, GM has either been unable, or has refused, to repair the Defect, because replacing one CUE System or its components with another CUE system or like components, cannot fix the Defect.

8.     GM, an experienced and sophisticated vehicle manufacturer, had knowledge of the Defect through, *inter alia*, (1) records from the National Highway Traffic Safety Administration ("NHTSA"), (2) customer complaints, (3) its own records of customers' complaints, (4) dealership repair records and requests for technical assistance, (5) warranty and post-warranty claims, (6) pre- and post-release internal durability testing, and (6) other various sources, yet failed to notify consumers prior to purchase of the nature and extent of the Defect plaguing Class Vehicles, or to provide any adequate post-purchase remedy.

9.     GM issued Technical Service Bulletins ("TSBs") to its dealers which also evidenced its early knowledge and testing of the Defect.

10.     Defendant knew, or should have known, of this critical Defect at the time of sale or shortly thereafter. Yet, notwithstanding this knowledge, GM has routinely failed to fully repair the Class Vehicles without charge when the Defect manifests. Moreover, GM failed to disclose the Defect to Plaintiffs and Class Members through its advertising, including on vehicle window stickers or at the point of sale or lease.

4

11.    GM's efforts have been entirely inadequate in resolving the Defect or providing relief to the Class. Moreover, GM has failed to alert Class Members of the true and unsafe nature of the Defect.

12.    Despite knowledge conveyed to Defendant by information from its affiliated dealerships, NHTSA consumer complaints, and its own internal records, including durability testing, Defendant has not recalled the Class Vehicles to repair the defective CUE Systems, has not offered its customers suitable repairs free of charge, and has not offered to reimburse customers forced to pay for the repairs out-of-pocket.

13.    In fact, rather than redesigning the defective components and installing non-defective components, GM purports to "repair" the Class Vehicles by performing ineffectual or insufficient software updates, part replacements, and other procedures that fail to fully resolve the Defect. Further, Class Vehicle owners incur or will incur out-of-pocket costs for these repairs because GM refuses to issue a recall to prevent the incurring of such costs. GM thus unfairly shifts the costs to the Class Members, and benefits or will benefit from the revenue generated by repeat repairs. Accordingly, consumers will be required to pay hundreds, if not thousands, of dollars to repair or replace the CUE Systems because of the Defect, and GM is unjustly enriched at their expense.

14.    Because of this failure, Plaintiffs and Class Members have been damaged.

**JURISDICTION AND VENUE**

15.    This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

16.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus

of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

17.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Delaware.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, GM's state of incorporation.

## THE PARTIES

19.     Plaintiff Crystal Robinson is an Alabama citizen who resides in Birmingham, Alabama. Plaintiff Robinson purchased a new 2014 Cadillac SRX on or around September 20, 2014.

20.     Plaintiff Richard Schellhammer is an Alabama citizen who resides in Tuscaloosa, Alabama. Plaintiff Schellhammer purchased a used 2014 Cadillac ATS in or around December 2015.

21.     Plaintiff William Braden is a Florida citizen who resides in Hudson, Florida. Plaintiff Braden leased a 2015 Cadillac SRX in or around December 2014, and subsequently purchased the 2014 Cadillac SRX in or around December 2017.

22.     Plaintiff Earl Kladke is a New York citizen who resides in Lakeview, New York. Plaintiff Kladke purchased a new 2016 Cadillac SRX on or around January 4, 2016.

23.     Plaintiff Joseph Palopoli, Jr., is a Florida citizen who resides in Coral Springs, Florida. Plaintiff Palopoli purchased a new 2017 Cadillac ATS in or around July 2018.

24.    Plaintiff Lana Savage is a Florida citizen who resides in Palm Coast, Florida. Plaintiff Savage purchased a new 2013 Cadillac SRX in or around July 2013.

25.    Plaintiff April Bradley is an Indiana citizen who resides in Bloomington, Indiana. Plaintiff Bradley purchased a new 2013 Cadillac SRX in or around September 2013.

26.    Plaintiff John Toda is a Kansas citizen who resides in Tecumseh, Kansas. Plaintiff Toda purchased a used 2014 Cadillac ATS on or around May 5, 2017.

27.    Plaintiff Maxine Glenn is a Maryland citizen who resides in Waldorf, Maryland. Plaintiff Glenn purchased a new 2016 Cadillac SRX in or around July 2016.

28.    Plaintiff Nicole Blanchard is a Michigan citizen who resides in Houghton Lake, Michigan. Plaintiff Blanchard purchased a used 2013 Cadillac SRX in or around May 2018.

29.    .

30.    Plaintiff Gladys Tubbs is a Michigan citizen who resides in Battle Creek, Michigan. Plaintiff Tubbs purchased a new 2014 Cadillac SRX in or around September 2014.

31.    Plaintiff Tonya Gruchacz is a New Jersey citizen who resides in Flemington, New Jersey. Plaintiff Gruchacz purchased a new 2014 Cadillac ATS on or around August 7, 2013.

32.    Plaintiff Robert Tyson is a New Jersey citizen who resides in Hillside, New Jersey. Plaintiff Tyson purchased a used 2014 Cadillac ATS in or around March 2017.

33.    Plaintiff Katrina Howard is a New York citizen who resides in Rochester, New York. Plaintiff Howard purchased a new 2013 Cadillac SRX in or around November 2012.

34.    Plaintiff Sheila Cauthen is a North Carolina citizen who resides in Greensboro, North Carolina. Plaintiff Cauthen purchased a 2013 Cadillac SRX certified pre-owned in or around December 2016.

35.    Plaintiff Mariano Lorenzo Macaisa is a North Carolina citizen who resides in Raleigh, North Carolina. Plaintiff Macaisa purchased a used 2013 Cadillac ATS on or around April 11, 2019.

36.    Plaintiff Gini Michelle Cox is a Texas citizen who resides in Midland, Texas. Plaintiff Cox purchased a new 2013 Cadillac ATS on or around March 31, 2014.

37.    Plaintiff Kendra Piazza is a Texas citizen who resides in Dallas, Texas. Plaintiff Piazza purchased a new 2015 Cadillac SRX in or around December 2015.

38.    Plaintiff David Conroe is a West Virginia citizen who resides in Bunker Hill, West Virginia. Plaintiff Conroe purchased a used 2013 Cadillac XTS on or around May 5, 2018.

39.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

40.    General Motors LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

41.    At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

## FACTUAL ALLEGATIONS

42.    GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In 2018, GM sold 2,954,037 vehicles in the United States alone and "had the number one market share in . . . North America[.]"[1]

---

[1]    *See* General Motors Company 2018 Annual Report (Form 10-K), at 2 (Feb. 6, 2019), available at: https://www.sec.gov/Archives/edgar/data/1467858/000146785819000033/gm201810k.htm (last accessed May 7, 2019).

43.     GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts.[2] Its net automotive sales through those dealerships, for its North American region in 2018, totaled $113,792,000.[3] After these dealerships sell cars to consumers, including the Plaintiffs and Class Members, they purchase additional vehicle inventory from GM to replace the vehicles sold, increasing GM's revenues. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles accrues to the benefit of GM by increasing its revenues.

44.     In addition, GM underscores the importance of its dealerships, as follows: "The quality of GM dealerships and our relationship with our dealers and distributors are critical to our success as dealers maintain the primary sales and service interface with the end consumer of our products."[4] Indeed, according to Mark Reuss, president of General Motors Company, "Our dealers are the face of GM to our customers[.]"[5] Further, GM stated:

> "Our commitment to quality and customer satisfaction extends to the experience customers have when they visit our dealerships. It is essential that we maintain a consistent level of sales and service excellence to earn and maintain customer trust. . . . We provide both technical and nontechnical training and tools to dealerships to help them meet or exceed their customers' expectations. This training includes modules for sales, finance, front office and management staff; apps for sales and service; and various reference documents such as FAQ documents. Different departments in the dealership relating to sales, as well as service, must maintain a certain level of training performance by meeting technical and nontechnical criteria. For example, to self-authorize warranty claims, a dealer must maintain 100 percent training for technicians at all times. Our GM Internal Audit Staff ensures dealer compliance by auditing all dealerships on a rotating basis. Dealers are required to achieve third-party Automotive Service Excellence certification of their facilities, an industry standard and a customer-recognized seal of

---

[2]     *Id.* at 3.

[3]     *Id.* at 25.

[4]     *Id.*

[5]     https://media.gm.com/media/us/en/gm/home.detail.html/content/Pages/news/us/en/2010/Aug/0805_dealer.html

quality."[6]

45.     Plaintiffs and Class members are intended third-party beneficiaries of contracts between GM and its dealerships; specifically, they are the intended beneficiaries of GM's implied warranties. The dealerships are Defendant's agents for sales and repairs. The dealers were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

46.     GM designed, manufactured, and distributed the Class Vehicles. GM has sold or leased, directly or indirectly, through dealers and other retail outlets, hundreds of thousands of Class Vehicles equipped with the CUE System in Alabama, Florida, Indiana, Kansas, Maryland, Michigan, New Jersey, New York, North Carolina, Texas, West Virginia, and other states.

47.     GM provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty with the purchase or lease of the Class Vehicles.

48.     The New Vehicle Limited Warranty for Cadillac-brand Class Vehicles (the "Warranty"), stated in relevant part:

> **What Is Covered**
>
> **Warranty Applies**
>
> This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> **Repairs Covered**
>
> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

---

[6]     https://www.gmsustainability.com/manage/customers.html

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 4 years or 50,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

***

**Other Terms**: This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty**.[7]

---

[7]     *See, e.g.*, 2015 Cadillac Limited Warranty and Owner Assistance Information at 2, 4, 12, available at https://my.gm.com/content/dam/gmownercenter/gmna/dynamic/ manuals/2015/cadillac/Multiple%20Model%20PDFs/2015%20Limited%20Warranty%20 and%20Owner%20Assistance%20Information.pdf (last accessed May 7, 2019) (emphasis in original).

A.    **The CUE**

49.    In 2011, GM began marketing the release of an in-vehicle "infotainment, navigation, and communication tools" to be included in 2012 (model year 2013) Cadillac models XTS, ATS, and SRX.[8]

50.    "In-Vehicle Infotainment" or "Infotainment" is an automobile industry term that refers to vehicle systems that combine entertainment and information delivery to drivers. Infotainment systems use audio/video interfaces, touchscreens, keypads, and other types of devices to provide those services.[9]

51.    The CUE System is Cadillac's proprietary Infotainment System, which GM began



developing in 2008.[10]

52.    The CUE System, which is built into the top of the vehicle's central instrument panel, includes a touch screen assembly or module. This requires a driver to use the CUE System's various functions by touching the screen.

---

[8]    *See* GM press release, "Cadillac CUE: Intuitive and Connected Driving in 2012" dated October 12, 2011, available at: https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html (last accessed September 8, 2019).

[9]    *See, e.g.*, Burk, Michael. "The Evolution of In-Vehicle Infotainment Systems, part one." March 14, 2019, available at: https://www.micron.com/about/blog/2019/march/evolution-of-in-vehicle-infotainment-systems-part-one (last accessed September 8, 2019).

[10]   *See* n.8.

53.     Thus, for a driver to access and use the vehicle's safety, navigation, communications, and entertainment features, the driver is required to use the touch screen, as the touch screen functions as the sole control system for those systems.

54.     The CUE System's touch screen defaults to a "Home Page," which has icons that depict the CUE System's various features. To access and control these features, the user presses the desired icon on the touch screen.



55.     For example, the CUE System includes the following features:

56.     Voice Recognition: By pressing the "Voice Recognition" icon on the touchscreen display, the user enables the vehicle's voice recognition system, permitting "hands-free" operation within the navigation, audio, phone, and weather applications.

57.     Audio: By pressing the "Audio" icon on the CUE System touchscreen display, the user accesses different audio sources, including AM and FM radio, and SiriusXM Satellite Radio (if equipped), CD and MP3 player, USB/SD ports, Bluetooth7 and an auxiliary input.

58.     Phone: By pressing the "Phone" icon on the CUE touchscreen display, a user can use certain features of his or her cellular phone when paired to the CUE through Bluetooth. For

example, a user can place and receive calls without using their hands, through the CUE System's voice-recognition system.

59.     Navigation: By pressing the "NAV" icon on the CUE touchscreen, a user can access a GPS system including maps, driving directions, routing preferences, current location, places of interest, traffic updates, an estimated arrival time, and other features.

60.     Climate: By pressing the "Climate" icon on the CUE touchscreen, a user can control the vehicle cabin's air temperature, including air conditioning, as well as mode settings that change air flow and direction (that is, through which air vents the air travels).

61.     Rear Vision Camera (or Backup Camera): Rather than being initiated by the user's touching an icon on the touchscreen, the Rear Vision Camera is a safety feature enabled whenever the vehicle is placed in Reverse. The touchscreen then converts into a video-type panel where the area behind the vehicle appears on the CUE touchscreen. According to NHTSA, using backup cameras could prevent half of the deaths caused by accidents driving in reverse.[11]  Indeed, beginning in 2018, the NHTSA required vehicle manufacturers to install backup cameras in all new vehicles, as more than 200 people are killed and over 12,000 more are injured each year due to "backover" crashes.[12]

---

[11]     https://www.autonews.com/article/20130620/OEM11/130629981/backup-camera-rule-for-cars-in-u-s-pushed- back-to-2015#axzz2iafFMKVW.

[12]     *See* 49 CFR § 571.111 2018; https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/ (last viewed November 22, 2019).

62.     The CUE debuted in 2012 (model year 2013) in Cadillac models XTS, ATS, and SRX.  The CUE was then included in other models as they were introduced or refreshed. The following chart depicts the Cadillac models ("Class Vehicles") that contain the CUE at issue:

**B.     Defendant Promoted the CUE's Safety Features**

| Brand: | Model: | Model Years: |
| --- | --- | --- |
| Cadillac | ATS | 2013 - 2017 |
| Cadillac | SRX | 2013 - 2017 |
| Cadillac | XTS | 2013 - 2017 |
| Cadillac | CTS Vin A | 2014 - 2017 |
| Cadillac | ELR | 2014 - 2017 |
| Cadillac | Escalade | 2014 - 2017 |

63.     Cadillac advertised the CUE as improving driver safety.  For example, Cadillac claimed "CUE doesn't replace your smartphone or your iPod. Rather it allows consumers to securely store those mobile devices while channeling the information on those devices, along with your navigation tools, weather maps with Doppler radar, AM/FM and XM radio, instant messages and emails, through a central portal in your Cadillac, keeping hands on the wheel and eyes on the road."[13]

64.     Similarly, Cadillac touted: "Most navigation systems prompt users to insert destination information by separately inputting state, city, street, and house number information.

---

[13]     https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html (internal citation and quotation marks omitted).

CUE users can manually or verbally input the entire destination address on one screen, saving time and keeping drivers focused on the road."[14]

65.     Further, "[CUE] also incorporates natural language voice recognition, which allows customers to safely place calls, enter destinations, browse media, play music and control other functions simply by telling the vehicle what to do."[15]

### C.     The Defect

66.     In connection with this case, Plaintiffs engaged an expert, who undertook a months-long investigation to understand the Defect.  As a result of that investigation, which included substantial testing and analyses of different defective CUE units, the expert was able to replicate and determine the Defect, as more fully described herein.

67.     The touch screen module or assembly is made up of two major components.

68.     The first component is a projected capacitance touch screen comprised of a glass sheet with electrode patterns on both sides.  These electrode patterns hold an electrical charge.  A user touching the screen changes the amount of charge at the point of contact, permitting the touch point to be determined by circuits.

69.     The second component is a plastic cover with channels.  The plastic cover sits in front of the projected capacitance touch screen and is the physical screen a user touches.

---

[14]     https://media.gm.com/media/us/en/cadillac/news.detail.html/content/Pages/news/us/en/2013/Mar/0321CadillacUE.html.

[15]     https://media.gm.com/media/us/en/gm/autoshows/new_york.detail.html/content/Pages/news/us/en/2013/Mar/nyas/26mar-cadillac/0326-cadillac-cts-design.html.

70.     Sandwiched in between the plastic cover and the touch screen glass is a silicone-like material.



71.     The CUE touch screen is defective in that the plastic cover is prone to delaminating or separating from the touch screen glass.  When this happens, the silicone-like material coalesces and forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevents a user's touch from being registered.  This, in turn, prevents a user from being able to access the CUE's various features.

72.     The Defect that causes the plastic cover and touch screen glass to separate can occur as a result of either mechanical stress or thermal stress—both of which are commonly experienced during normal operation of a vehicle.

    *1. **Mechanical Stress Failure***

73. Mechanical stress occurs as a result of the typical vibration and shaking a vehicle experiences during operation. Because of the Defect, this standard mechanical stress can cause the plastic cover to separate from the touch screen, rendering the CUE inoperable.

74. The CUE was defectively designed because the placement of the screws and rubberized gasket allow the plastic cover to become separated from the frame of the CUE. When this occurs, the silicone-like material under the plastic cover will spider-web and crack.

75. The CUE has a total of 8 screws that hold the plastic cover to the touch screen. Six of the eight screws are located at the top of the screen, and only two screws are placed at the bottom. As a result, the top portion of the plastic cover is firmly attached to the touch screen.



76.     In contrast, there are only two screws on the bottom portion of the plastic cover, which causes it to flex and move when pressure is applied. The figure below shows the space between the metal frame and the plastic cover.  When the plastic cover is flexed or moved it will eventually spider-web and cause the unit to fail.



Some motion when pressed

77.    The placement of the screws is a defective design, as it allows too much movement to occur.  This, in turn, renders the plastic cover prone to separating from the touch screen glass. When this happens, the silicone-like material forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevent a user's touch from being registered.    Another contributing factor to the mechanical failures is the inadequate rubber gasket.  The way the gasket is cut allows for a gap between the touch screen and the plastic cover, which prevents a user's inputs from being registered by the touch screen.  This gap also allows for more flexibility in the plastic cover, which leads to the spider-webbing defect.



### 2.    *Thermal Stress Failure*

78.    The second failure scenario is where the plastic cover delaminates or separates due to temperature fluctuations.

79.    Specifically, the touch screen assembly is made up of materials with different thermal expansion coefficients (e.g., a glass touch screen and a plastic cover).  Upon heating or cooling, thermal expansion mismatches can cause delamination between the plastic cover and the touch screen glass.

80.     One common source of these thermal fluctuations are weather conditions.  Hot weather can cause a vehicle's interior to become hot—much hotter, in fact, than what is experienced outside of the vehicle.  As a result, the various components in the vehicle need to be able to withstand hot temperatures.

81.     The Automotive Electronics Council ("AEC") was originally established by Chrysler, Ford, and Defendant to establish common part-qualification and quality-system standards.  The AEC guidelines for component parts used in automotive applications depicted below.   Pursuant to the AEC guidelines, at a minimum, the CUE must be able to withstand a temperature of 85-degrees Celsius.

| GRADE | TEMPERATURE RANGE | | PASSIVE COMPONENT TYPE<br>Maximum capability unless otherwise specified and qualified | TYPICAL/EXAMPLE APPLICATION |
| | MINIMUM | MAXIMUM | | |
| --- | --- | --- | --- | --- |
| 0 | -50°C | +150°C | Flat chip ceramic resistors, X8R ceramic capacitors | All automotive |
| 1 | -40°C | +125°C | Capacitor Networks, Resistors, Inductors, Transformers, Thermistors, Resonators, Crystals and Varistors, all other ceramic and tantalum capacitors | Most underhood |
| 2 | -40°C | +105°C | Aluminum Electrolytic capacitors | Passenger compartment hot spots |
| 3 | -40°C | +85°C | Film capacitors, Ferrites, R/R-C Networks and Trimmer capacitors | Most passenger compartment |
| 4 | 0°C | +70°C | | Non-automotive |

82.     However, because of the Defect, the CUE can experience delamination and spider-webbing—and is therefore rendered inoperative—when exposed to a temperature of 85-degrees Celsius. As a result, the CUE fails to satisfy Defendant's own minimum standards.

83.     In addition, once the delamination occurs, it will worsen when exposed even to temperatures lower than 85-degrees Celsius (185-degrees Fahrenheit).

**D.     The Defect Poses a Safety Risk and Causes Unsafe Driving**

84.     The CUE System fails to enhance driver safety or maintain, as marketed by GM, a "fully capacitive faceplate pulse [that] when pressed to acknowledge the driver's commands and

helps keep the driver's eyes on the road." Instead, the Defect causes drivers to become distracted, by impairing or rendering inoperative many of the CUE System's safety features.

85.     For example, once the Defect has manifested, the driver is unable to navigate to the proper menu because the touchscreen is inoperative. Thus, a driver often cannot, among other things: (1) pair an electronic device to the CUE using Bluetooth because s/he cannot navigate to the appropriate devices on the CUE touchscreen menu; (2) answer calls through the touchscreen or to make calls using the touchscreen, even if the driver's cellular phone was paired via Bluetooth before the Defect manifested; or (3) use the navigation system by viewing nearby vendors, such as gas stations, on the touchscreen, or entering destinations into the navigation system using the touchscreen. These are only a few of the safety and technology functions rendered inoperative due to the Defect.

86.     Even more troubling, the spider-webbing that results from the Defect obscures the CUE display, which, in turn, distorts or masks the backup camera's images, rendering the camera unusable. A backup camera is a required safety device in all cars.[16]

87.     In addition to the obvious safety risk that an inoperable backup camera poses to drivers who may not see obstructions or the risk to small children and animals who would otherwise be visible in the CUE touchscreen display, the Defect causes distracted driving and presents an unreasonable safety hazard instead of enhancing safety as advertised.

88.     In 2017, distracted driving killed 3,166 people. According to the Centers for Disease Control, there are three types of distracted driving: (1) visual (i.e., not focusing on the road); (2) cognitive (i.e., thinking about something other than the road and immediate driving needs); and (3) manual (i.e., physically taking one's hands off the steering wheel).[17]

89.     The Defect poses a safety risk by distracting drivers in all three ways highlighted by the CDC: (1) drivers are unable to read or see the screen clearly, causing them to divert their

---

[16]     *See* 49 CFR § 571.111 2018; https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/ (last viewed November 22, 2019).
[17]     *See* NHTSA, "U Drive. U Text. U Pay" available at: https://www.NHTSA.gov/risky-driving/distracted-driving (last viewed September 9, 2019).

eyes from the road longer than under normal conditions; (2) drivers become focused on, and frustrated by, the malfunctioning display while driving; and (3) when the touchscreen works intermittently or inconsistently, drivers must remove their hands from the steering wheel more frequently and for longer periods of time than when the CUE functions as it was advertised to do.

**E.    GM's Knowledge of the Defect**

90.    Plaintiffs are informed and believe and based thereon allege that prior to the sale of the Class Vehicles, GM knew, or should have known, about the Defect through its exclusive knowledge of non-public, internal data about the Defect, including: pre-release testing data; early consumer complaints about the Defect to GM's dealers who are their agents for vehicle repairs; warranty claim data related to the Defect; aggregate data from GM's dealers; consumer complaints to the NHTSA and resulting notice from NHTSA; dealership repair orders; testing conducted in response to owner or lessee complaints; GM service bulletins applicable to the Class Vehicles; and other internal sources of aggregate information about the problem. Nevertheless, Defendant has actively concealed and failed to disclose the Defect to Plaintiffs and Class Members at the time of purchase or lease and thereafter.

91.    GM makes available online material information regarding the characteristics, benefits, and quality of the Class Vehicles. It maintains a website regarding the Class Vehicles. It also broadly disseminates information regarding the characteristics, benefits, and quality of the Class Vehicles that is closely tracked and reported by a large array of informational outlets, including automotive-focused websites such as Edmunds.com, Kelley Blue Book, Auto Trader, among many others. GM knew that its consumers depended in part on these sources for information about its vehicles, and had GM disclosed the Defect, these sources would have likewise reported that material information.

92.    Likewise, as GM's authorized agents, dealerships are also a primary source of information from GM to consumers regarding the vehicles, and GM exercises great control over the information that its authorized dealerships provided to the consuming public— Plaintiffs and

Class members—regarding the Class Vehicles. In addition, GM communicates through its authorized dealerships to the purchasing public.

93. Plaintiffs and Class members received information about the characteristics, benefits, and quality of the Class Vehicles from GM dealerships. The dealerships sell the vehicles with Monroney stickers, also known as window stickers, that contain important, material information regarding the vehicles from GM. Likewise, dealerships provide prospective buyers with brochures and other similar materials with important, material information regarding the vehicles from GM. Additionally, the authorized dealerships' salespeople provide prospective purchasers with important, material information from GM regarding the vehicles. Furthermore, under the terms of GM's express warranty, Plaintiffs must bring their vehicles to GM dealerships to perform warranty repairs, and it is through its dealership network that GM circulated its technical service bulletins regarding the Defect. In sum, GM knew that its customers depended in part on its authorized dealerships for information about its vehicles, and GM's authorized dealerships would have disclosed the Defect had GM required it. Yet, GM omitted and failed to disclose the Defect through one of the many consumer-focused informational channels, including the vehicles' window stickers, brochures, and through other materials sold at the dealerships and provided to the salespeople.

94. However, GM failed utterly to disclose the defect through these or any sources.

1. ***GM's Press Releases Touting Extensive Research and Development of the CUE System Demonstrate Its Knowledge of the Defect Through Non-Public Pre-Sale Testing Exclusively in GM's Control.***

95. Well before the first Class Vehicle was sold, GM knew or should have known that the CUE Systems were defective in design and/or manufacture and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including driver distraction. Beginning development in 2008, GM repeatedly touted its "consumer-focused methodology" in designing the CUE System as early as this January 8, 2012 press release:

Among the many innovations to come from the research [behind the CUE System] was proximity sensing, natural voice recognition, haptic feedback and our unique capacitive touch screen with the concealed storage compartment behind the user interface.

'Cadillac CUE enables drivers to put the smartphone or tablet away, while channeling the capability and media from those devices through the car, via an elegant and intuitive user experience,' says Jim Vurpillat, Cadillac global marketing director.

Using a clean sheet approach, Cadillac revisited not just the hardware, but the entire interaction between driver and car. Topping the list was the user interface, which in the automotive industry has been an Achilles' heel for users and critics alike.

The CUE team, made up of designers, engineers and software developers, used a consumer-focused methodology called Contextual Design. It's a process in which interviewers immerse themselves into the lives of users to understand the most subtle aspects of how they use products, how they work around shortcomings, and how they'd wish for improvements.

So team members rode along with luxury car owners on daily commutes, tagged along on vacations and sometimes squeezed in the back seats with families and groceries. The team constantly sketched their observations, no matter how mundane. Sometimes the observations were troubling, such as cell phones stuffed into cup holders or door pockets for constant reference while driving.

When the team members returned, they categorized thousands of observations, affixing them to a long wall at the General Motors Design Center in Warren, Mich. The CUE team would "walk the wall" to analyze driver frustrations, identify possible new capabilities, and look for common threads of where existing systems were failing or frustrating users. From there, they began to devise solutions.[18]

96.    In later press releases, GM continued to trumpet the extensive research and development it used to develop the CUE System, stating, "CUE development began in 2008 when

---

[18]    *See* GM press release, "Contextual Research Drives Innovative Tech Design," dated Jan. 8, 2012, available at: https://media.cadillac.com/media/us/en/cadillac/news.detail.html/content/Pages/news/us/en/2012/Jan/0108_cadillac_cue.html (last viewed September 8, 2019).

Cadillac designers rode with 32 consumers for six months to study driver habits. Engineers and designers then used the data to develop CUE."[19]

2.  ***GM's Own Service Bulletins Demonstrate that GM Has Known About the Defect for Years.***

97.    From December 2014 to August 2017, GM issued at least four service bulletins and service bulletin updates ("Service Bulletins," "Technical Service Bulletins," or "TSBs") to its dealers in the United States, but not its customers, acknowledging the Defect in the Class Vehicles.

98.    In December 2014, GM issued a TSB titled "Bulletin No.: PIC6055" titled "Integrated Center Stack Display Delaminating Distorted or Appears Cracked Behind Lens." TSB PIC6055 further stated that "[s]ome customers may report that their radio screen appears bubbled, cracked, or is delaminating." The TSB directed its technicians, "If this concern is encountered, replace the ICS (Integrated Center Stack by following the SI replacement procedure."[20] This TSB included a "Warranty Information" section with a specific Labor Operation code for technicians to use when replacing the ICS.

99.    According to this TSB, the Defect affected the following models:

- Cadillac ATS (model years 2013-2014)
- Cadillac SRX (model years 2013-2014)
- Cadillac XTS (model years 2013-2014)
- Cadillac CTS Vin A (model year 2014)

100.    From January 20, 2016 to October 2018, GM subsequently issued three more versions of PIC6055, numbered PIC6055A through PIC6055C, each time expanding the number of models and model years affected by the Defect.

101.    In or around April 2015, GM issued PIC6055A to include more vehicles, listing the following as affected models:

- Cadillac ATS (model years 2013-2015)

---

[19]    *See* n.8 (emphasis added).
[20]    https://static.NHTSA.gov/odi/tsbs/2014/SB-10073912-0699.pdf

- Cadillac SRX (model years 2013-2015)
- Cadillac XTS (model years 2013-2015)
- Cadillac CTS Vin A (model years 2014-2015)
- Cadillac ELR (model years 2014-2015)

102.    In or around October 2016, GM issued PIC6055B to include more vehicles, listing the following as affected models:

- Cadillac ATS (model years 2013-2016)
- Cadillac SRX (model years 2013-2016)
- Cadillac XTS (model years 2013-2016)
- Cadillac CTS Vin A (model years 2014-2016)
- Cadillac ELR (model years 2014-2016)
- Cadillac Escalade (model years 2014-2016)

103.    In or around August 2017, GM issued PIC6055C to include more vehicles, listing the following as affected models:

- Cadillac ATS (model years 2013-2017)
- Cadillac SRX (model years 2013-2017)
- Cadillac XTS (model years 2013-2017)
- Cadillac CTS Vin A (model years 2014-2017)
- Cadillac ELR (model years 2014-2017)
- Cadillac Escalade (model years 2014-2017)

104.    Each of the above bulletins demonstrates GM was aware of the Defect and recognized it was covered under its Warranty by including warranty codes to effectuate the repair.

3.    ***Numerous Consumer Complaints on the NHTSA Demonstrate That GM Was Aware of the Defect.***

105.    Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

106.    In fact, according to GM, "Externally, GM maintains an open dialogue with the National Highway Traffic Safety Administration (NHTSA), including monthly meetings with senior agency officials, with expedited discussions as needed, covering field investigations, safety recalls and other issues. GM also participates in periodic meetings with NHTSA and other stakeholders to advance safety discussions that benefit the industry as a whole."[21]

107.    Automakers have a legal obligation to promptly identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects.  *Id.* Thus, GM knew or should have known of the many complaints about the Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Defect.

108.    Complaints that owners and lessees filed with the NHTSA demonstrate that the Defect is widespread, contributes to driver distraction, and that it manifests without warning. The complaints also indicate GM's awareness of the problems with the CUE System and the safety concerns that the Defect poses. The following is just a small sampling of the numerous complaints, often expressly safety-related, describing the Defect (spelling and grammar mistakes remain as found in the original, capitalization changed from original all-caps format with capitalization-related edits added) (Safecar.gov, Search for Complaints (September 9, 2019), http://www-odi.NHTSA.dot.gov/complaints/).

    a.  **DATE OF INCIDENT:** May 13, 2016
        **DATE COMPLAINT FILED:** May 28, 2016
        **NHTSA/ODI ID:** 10871315
        **SUMMARY:**

---

[21]        https://www.gmsustainability.com/manage/safety.html

On May 13, 2014, at 10 am I had to travel less than 2 miles from my own house to my podiatric doctor. The car was stationary until the end of my appointment about 30 minutes.

Upon going back to my house, I noticed some like scratches on the dashboard screen that house all controls, such to play a radio station etc.

The are on the right side of the such screen about 2 inches wide and all the way to the top.

On may/16/2016 I called baker Cadillac of Charleston SC, explain what it had happen, were told to bring the car so they could look at it, some we did on may/24/2016, were told that will need to order the part and will let me know when they had it, I had to insist for the person to write an order, some he did but not vey happy.

While we were waiting for the form to be ready another employee told us that if we see a red light not to drive and that had happen on other vehicles and they are several pieces of plastic on that configuration, upon returning home a long about 1.1/4 inch red light appeared on the left side of such screen, as today may/28/2016 the vehicle is not been out of my garage and it will be there till the time to take to dealer to be repaired. . . .

b. **DATE OF INCIDENT:** May 19, 2016
   **DATE COMPLAINT FILED:** May 19, 2016
   **NHTSA/ODI ID:** 10865844
   **SUMMARY:**

Cadillac CUE system and center stack system freezing and unresponsive. The Cadillac ELR's HVACHVAC, navigation, audio and other system functions are all controlled only by touch sensitive panel either in the CUE screen or below it. When CUE freezes or lags as it often does this causes a dangerous occurrence where the driver must divert attention from the road to operate the car's system. While on my normal commute this morning I went to adjust my air conditioning when the system froze. I waited for the system to catch up or un-freeze and as the screen started to respond my distance sensor sounded and I had to slam on my brakes to avoid hitting a car that had slowed in front of me. The constant malfunction of this slow operating system diverts entirely too much attention away from the road and creates an unsafe driving experience. The alternative is to not engage with audio or HVAC controls while driving, which is not the intended design of the car. The lagging CUE system has personally caused distress and nervousness while driving this car. I've addressed these

concerns with both Cadillac executive team and two local dealerships all of which say the system functions as designed.

c.   **DATE OF INCIDENT:** September 12, 2016
     **DATE COMPLAINT FILED:** October 3, 2017
     **NHTSA/ODI ID:** 11031539
     **SUMMARY:**

     The computer on the dash that controls the backup cam radio etc. Has been replaced while under warranty began cracking for no apparent reason. Cadillac will not replace the part and cannot guarantee the part will not fail a 3rd time. Told many people have this problem.

d.   **DATE OF INCIDENT:** November 16, 2016
     **DATE COMPLAINT FILED:** December 16, 2016
     **NHTSA/ODI ID:** 10935862
     **SUMMARY:**

     Information center Cadillac CUE does not operate. Brought to dealer on 11/17/2016 and was told 30 days to several months on back order. Today is 12/16/2016 called dealer no estimated completion time. Called Cadillac same answer. The Cadillac CUE controls A/C, heat, radio and all the accessories. Does this fall under the lemon law? I have breathing problems and can't safely drive this vehicle. Temperatures this weekend will be -12 degrees Fahrenheit. Please advise what actions I can take to resolve this issue asap.

e.   **DATE OF INCIDENT:** September 12, 2016
     **DATE COMPLAINT FILED:** October 3, 2017
     **NHTSA/ODI ID:** 11031539
     **SUMMARY:**

     The computer on the dash that controls the backup cam radio etc. Has been replaced while under warranty began cracking for no apparent reason. Cadillac will not replace the part and cannot guarantee the part will not fail a 3rd time. Told many people have this problem.

f.   **DATE OF INCIDENT:** November 18, 2017
     **DATE COMPLAINT FILED:** December 1, 2017
     **NHTSA/ODI ID:** 11051698
     **SUMMARY:**

     Shortly arriving being moved to Texas by the army, I noticed a hairline crack in the top left corner of my CUE navigation system. After a few days the crack spread and began affecting the touch screen. Initially a small section at the bottom of the screen stopped responding to touch. Thus, making it impossible to change radio

stations or enter an address into the navigation. Approximately a week
later the entire CUE stopped working. From what I have seen online,
this is a common issue for the Cadillac CUE shortly after vehicles
reach 50k miles.

g. **DATE OF INCIDENT:** December 18, 2017
   **DATE COMPLAINT FILED:** January 14, 2018
   **NHTSA/ODI ID:** 11062747
   **SUMMARY:**

My Cadillac CUE touch sense touch screen is no longer functioning at
any time, sitting still or while the vehicle is in motion. The screen is
spider webbed (delamination of conductive layer of material behind
the glass) and no longer allows me to set things like the collision
avoidance, auto- braking and lane departure options as well as many
other non-safety related features. This is clearly a manufacturing
defect and I have read at one time Cadillac had a backlog of over 4000
vehicles waiting on replacement CUE modules but yet no voluntary
recall. Hopefully the NHTSA can look into this matter and require
Cadillac to correct this problem for owners no longer under warranty
since some functions with the touch screen are related to vehicle safety
(collision avoidance, auto-braking and lane departure).

h. **DATE OF INCIDENT:** June 30, 2017
   **DATE COMPLAINT FILED:** June 1, 2018
   **NHTSA/ODI ID:** 11099193
   **SUMMARY:**

Tl*the contact owns a 2013 Cadillac SRX. The contact stated that the
Cadillac user experience (cue) screen was cracked. As a result, the
various functions that the CUE screen controlled were no longer
functional. The failure occurred while at a goodyear repair facility.
The goodyear technician informed the contact that the failure was due
to extreme temperatures. The vehicle was not taken to a dealer for
diagnostic testing or repairs. The manufacturer was notified and did
not assist. The failure mileage was approximately 61,000.

i. **DATE OF INCIDENT:** June 8, 2018
   **DATE COMPLAINT FILED:** June 15, 2018
   **NHTSA/ODI ID:** 11102179
   **SUMMARY:**

The Cadillac CUE (information/ navigation / air condition system)
developed spider web type cracks inside the screen; this makes it hard
to see or use control features. I went online and found hundreds of
people are having the same issue. One person has only 19,000 miles
and has the web like cracks. It was 90° when I got into my car and saw

a few of these cracks (these cracks are smooth to touch on screen), but a week later it's gotten bigger. A source says it's a factory defect, and that the cracks are the glue or adhesive has dissipated and is detaching the screen from the actual component. I have 44,000 miles on my vehicle ... It stays under the carport but is still having this issue. With so many people complaining and posting pictures on general motors discussion thread, one would think something would've gotten done. As stated before, it was a small line and it's constantly spreading throughout the Cadillac CUE screen. It's a simple issue, but should consumers have to pay the dealership for something they have no control over? Here is the link with others complaining about the same thing. Https://www.Cadillacforum.com/forum/Cadillac-SRX-10/cue-screen-spider-webbing-16740/

j.  **DATE OF INCIDENT:** June 6, 2018
    **DATE COMPLAINT FILED:** June 18, 2018
    **NHTSA/ODI ID:** 11102422
    **SUMMARY:**

My 2014 Cadillac CUE screen has developed a spider web cracks which prevent me from seeing through the screen. This has become a safety issue because I am unable to view the backup cameras. This is a known issue with Cadillac with numerous complaints. I have only 35,000 miles on my car. One day after leaving my car outside during a hot day, the cracks appeared. Cadillac/GM should be responsible for this defective product.

k.  **DATE OF INCIDENT:** May 12, 2018
    **DATE COMPLAINT FILED:** August 5, 2018
    **NHTSA/ODI ID:** 11115815
    **SUMMARY:**

The CUE infotainment system is starting to fail. Several selections i.e. "media" and "scan" are not working. The clear screen cover has started to crack. It has come to my attention that this is a widespread problem to the degree that the system fails totally shutting down all the music capabilities, rear camera, and use of the on-star navigation system as well.

l.  **DATE OF INCIDENT:** March 1, 2018
    **DATE COMPLAINT FILED:** September 29, 2018
    **NHTSA/ODI ID:** 11132253
    **SUMMARY:**

Approximately 6 months ago, I noticed a small stress fracture appear in the bottom left corner of the central digital dashboard of my vehicle. The dashboard projects safety, entertainment and automobile operating

status (e.g. Deflated tires, OnStar alerts, etc.). As the fracture grew it revealed a spider web of fractures distorting the dashboard and affecting the system's operation. The system would sudden begin flashing different icons, swiping from side to side which is very distracting. The digital icons are no longer functional, yet the fractures continue to grow, and the dashboard is very distracting while driving.

We reported the defect to Marvin K. Brown Cadillac and was informed by the service advisor, merle porter, several other SRX owners have reported the same issue, in which GM recognized as a vehicle defect. Mr. Porter reported the defect to gm, however, GM did not accept responsibility and refused to recall the component or replace the component.

On 09/29/2018, I submitted a complaint to GM asking for a further investigation (Case# 84675794778).

The origin of the fracture is located in the bottom left corner of the panel and no external force or impact is visible and no damage was occurred by me or my passengers. I feel this defect is a critical safety issue due to its driver distracting randomly and consisting moving icons.

m. **DATE OF INCIDENT:** October 1, 2018
   **DATE COMPLAINT FILED:** October 12, 2018
   **NHTSA/ODI ID:** 11139973
   **SUMMARY:**

CUE radio, climate, navigation, Bluetooth system, keeps freezing up. Now the screen has begun to spider crack. This is a very common problem amount all Cadillac's models using the cue. It is strange that they haven't a recall and fix.

   4.   *Consumer Complaints on Internet Forums—and GM'S Responses Thereto—Demonstrate That GM Was Aware of the Defect*

109.    Similarly, complaints posted by consumers on internet forums demonstrate that the Defect is widespread, poses serious safety risks, and can manifest without warning and/or suitable repair. Moreover, these complaints conclusively establish that GM was aware of the problems years ago given that ***GM monitored and responded to these complaints, as demonstrated below.*** What follows is just a sampling of numerous such complaints and GM's responses (spelling and grammar mistakes remain as in original).

a.    **Complaints on CadillacForums.com**

110.    Scores of consumers complained about the Defect on Cadillacfourms.com, including but not limited to the following complaints and responses by Cadillac Customer Care representatives:

    a.    On May 14, 2014, a consumer complained about the Defect:

> *I have an 2013 ATS 2.0 and recently I discovered there is an INTERNAL, crack started on the lower left corner of the Cue. There were no scratches or damage to the peripheral area. I discovered this on the day I parked outside lot with a record heat of over 100 degree. Don't know if there is anything to do with it but it just happened. Interested to discover if anyone heard of such a case. Again, it is internal crack and only can be seen but no by touch. Thanks in advance.*

    b.    On May 14, 2014, an official representative of GM with Cadillac Customer Care responded to the complaint:

> *Hello NewbieATS,*
>
> *I am sorry to hear of the crack you've recently noticed in your vehicle. I understand you are looking for advice from other forum members, but if you want your local Cadillac dealership to look into this for you, please feel free to send me a private message, I am more than happy to assist.*
>
> *Regards, Laura M.*
>
> *Cadillac Customer Care*

    c.    On May 16, 2014, a consumer complained about the Defect:

> *Mine was brand new purchased March 2013. So far, my dealer seems good about it but will find out for sure tomorrow when I bring it in, but I don't expect any surprises. The cracking is getting worse, but the CUE still works fine.*

    d.    On May 17, 2014, GM responded to the above complaint:

> *Hello bravnik,*

*If you would like to further discuss your situation or keep us updated after your dealership visit, please feel free to send us a private message. We are more than happy to assist anyway that we can!*

*Sincerely, Laura M.*

*Cadillac Customer Care*

e.   On July 7, 2014, a consumer complained about the Defect:

*I took my XTS in for regular service and to take care of a recall and when I picked it up from the dealer (after hours) the glass over the radio/CUE was spider webbed from the inside. There is no impact mark or signs of excessive pressure, the outside surface is totally smooth. We are in New Orleans and it was about 95 outside when I picked up the car, so the only thing I can think of is the extreme heat caused it to break from the inside. I have to get the car in to have the dealer look at it and hopefully get it fixed thru warranty without a major headache.*

*Anyone heard of this happening?*

*It's been a rough couple of weeks with my Cadillacs and glass. My Escalade split a windshield sitting still in the driveway.*

*After jumping thru all the hoops Cadillac is going to replace it.*

f.   On July 9, 2014, GM responded:

*Hello Edjeeg,*

*I hope I am not reaching out to you too late! Were you able to get your CUE screen fixed by your local dealership? If you are still in need of assistance, please let me know. I would be happy to help. Either way, I would like to know how things are going with the vehicle.*

*Katie O.*

*Cadillac Customer Care*

g.   On March 25 and April 2, 2015, two consumers complained about the

Defect:

*I just discovered the same problem on my 2014 CTS V-Sport. Dealer says they have to look at it first to see if its covered by warranty. My fear is they will try to claim I broke it.*

*I just discovered the same issue on my CTS when I came out of work today the crack is on top right cover inside the glass. Carlos did the dealer fix yours?*

h.  On April 3, 2015, Defendant responded:

*Hello FLCadillacGuy,*

*I'm sorry to learn you are experiencing concerns with your CUE display. Please let me know if I can provide an additional layer of support while you're working with the dealership. Just send me a private message with your full contact information, VIN, mileage and the name of your dealership.*

*Katie O.*

*Cadillac Customer Care"*

i.  On May 4, 2015, a consumer complained about the Defect:

*One more cracked CUE screen. Semi-circular cracks were first [scr]ween on the left side and then after three days, the same appeared on the right side. I do have an appointment at Ed Morse Cadillac Brandon tomorrow and hopefully, they will resolve this time. I also have problems with my liftgate (2014 SRX); when I depress the button to open the lift-gate, I hear two quick clicks and cannot open the gate. I have to try several times to beat the second click. Hopefully, this item will also be resolved.*

j.  On May 5, 2015, GM responded:

*Hello zoki.mbolekwa,*

*I am sorry to hear about each of these concerns with your SRX, but it is good to know that you will be working with the dealership to resolve them. Please let us know how the visit goes, and feel free to PM [private message] us if you require any additional assistance moving forward with this process.*

*Have a great day, Austin J.*

*Cadillac Customer Care*

k. On June 15, 2015, a consumer complained about the Defect:

*So, today was the hottest day in Atlanta so far this year…and since I bought my CTS last November. My car sat in my work parking lot for 9 hours today, closed windows and closed sunroof shade. I got in it, and drove to the gym, about 40 minutes. I had the air on, but nothing extreme. When I came out of the gym, the screen on my CUE display is "cracked" on the bottom right corner, sort of in a circular pattern…definitely "under" the glass (if that's what the material actually is). Has this happened to anybody else? I'll be going to the dealer tomorrow, but I thought I'd ask here, because I'm a little mad about it tonight! Thanks!*

l. On June 16, 2015, GM responded:

*Hello billrat,*

*We sincerely apologize for this inconvenience with your Cue screen but are happy to hear that you will be visiting the dealership today. Please keep us updated on your experience and feel free to reach out to us directly should you need further assistance with this concern.*

*Sincerely, Samantha N.*

*Cadillac Customer Care.*

m. On April 19, 2016, GM responded to another complaint about the Defect:

*Hello mrtimstik and Jod,*

*We regret to hear that you both are experiencing this concern with the CUE display screen and understand how this may be frustrating. If you would like an additional layer of support while you work with your dealership towards a resolution, we would be happy to assist. If this is something of interest to you, please feel free to send us a private message. Kindly, Samantha N.*

*Cadillac Customer Care*

> **b.**     **Complaints on CadillacForum.com**

111.     Below are a sampling of customer complaints and official responses by GM's "Cadillac Customer Care" representatives:

> a.     On February 21, 2016, a consumer complained about the Defect as
>
> follows:
>
> *Hi,*
>
> *I came out to my 2014 SRX yesterday after not driving it for a few days. I noticed that the CUE screen on the left side had some spider webbing cracks in the scree[n], NO impact to the screen from objects and you can't feel the cracks with your nails. I drove it for about 1 hour with the heat on and it appears to have spread into longer cracks. What gives? I'm contacting my dealer and the Cadillac customer service department and see what they are going to do. I only have 17k on it. I HOPE they don't give me a problem and say it's from abuse or misuse, it is a touch screen and I see that other Cadillac's are having the same issue.*
>
> *-Jim.*
>
> b.     On February 23, 2016, GM responded to the above complaint:
>
> *Hi Jim,*
>
> *I'm very sorry to hear about these cracks in your CUE screen. Were you able to get this repaired by your local dealership? If you are still in need of assistance, please send us a private message; we would be happy to help.*
>
> *Ashley R.*
>
> *Cadillac Customer Care.*
>
> c.     On January 20, 2018, a consumer complained about the Defect as follows:
>
> *I have a 2013 Cadillac ATS with spider cracks on my CUE screen I have 67,000 miles and I am out of warranty. When I drive and the sunlight hits it my radio goes Garza. I've read other forums and noticed this is an ongoing problem. It was replaced once before when I was still under*

*warranty and now it's happened again. Why does this continue to happen?*

d.  On March 27, 2018, GM responded to the above complaint:

*Hi, Nathan. We regret to hear of your concern with your 2013 ATS Cue Screen. We understand how frustrating repeat concerns can be. We would like an opportunity to review your situation further. Please e-mail us at socialmedia@gm.com and include "ATT: Kell" in the subject line. We look forward to your reply there.*

*Kell S.*

*Cadillac Customer Care.*

e.  On March 14, 2018, in response to numerous consumer complaints

regarding the Defect, GM responded:

*We regret to hear of your concerns with your CUE screen on your 2014 SRX. We are here to help the best we can and review vehicle concerns on a case-by-case basis. We would like an opportunity to address your situation further. Please send us an e-mail at socialmedia@gm.com "ATTN: Kell" and we'll be able to assist you further. We look forward to your response there.*

*Kell S.*

*Cadillac Customer Care.*

f.  On May 24, 2018, GM responded to a consumer complaint about the

Defect, as follows:

*Hello, Jonscott610. We regret to see the sentiments that you have expressed. We strive to provide high quality, luxury vehicles that exceed our customers' expectations. Please know that your frustrations are certainly recognized and has been do\*\*\*ented within our internal system. Should you need further assistance, please email* <u>socialmedia@gm.com.</u>

### c.    <u>General Online Complaints</u>

112.    In addition to the numerous consumer complaints detailing the Defect on the Cadillac Websites, consumers also described how the Defect negatively affected the CUE's features.

113.    For example, consumers posted the following complaints on the Cadillac Owner/Enthusiast Website and Forum:

    a.    December 7, 2016

*I have a 2016 SRX Premium. My CUE started acting erratically and was unresponsive to touch though it jumped all by itself. I went to the dealer who informed me there was a heat crack on the screen (which I did not see due to the glare) and that's what caused the issue. He said a part would be ordered. Its been almost a month...this is extremely annoying that I cannot answer calls and have ended up using OnStar minutes for calls because the screen would not allow me to dial using my linked phone. I fail to understand...why this part is not in stock given the common complaint of this issue (reading this thread).*

    b.    September 23, 2018

*Two weeks ago, my wife noticed what started out as a small web crack in the right lower corner of the CUE display. None of the touch controls were affected. Since that time, the size of the cracking has expanded and now touch controls are erratic. Steering wheel controls are still working. I'm out of warranty so any repair is on my dime. Based on the posts I've read here on the forum, I'm fairly certain the touchscreen is going, but would like to attempt a hard reset. Are there any instructions available on how to perform a hard reset?*

114.    Consumers also posted the following complaints on the Cadillac Forum:

    a.    March 2, 2017:

*Hello Ashley,*

    *My name is Fabian zuniga and I own a beautiful 2013 ATS 2.0 but I am also having this issue. With*

*dropping temperatures and using my heat my screen has cracked. First with a small spider web like crack and now it has taken over about 35% of the screen making some of the radio/heating/cooling options unavailable. There is no physical crack or damage to the screen itself but to the interior glass. I'm hoping you can point me in the correct direction to fixing this issue. I have 41985 currently miles on my vehicle.*

*Fabian Zuniga*

b.  May 25, 2018:

*I have a 2014 ATS with 32k miles on it. I got into to my car after work and I noticed that for no reason my Cue is spider webbing and I cannot use it like the whole thing is stuck on the home screen. I see that is a frequent problem. My warranty expired a few months ago. It is imperative I get this fixed due to the dangers of its spider webbing all the way through and I will not be able to use the backup camera. What steps can I take on getting this issue fixed?*

c.  September 27, 2018:

*Hello,*

*I have a 2014 ATS 2.0 Turbo and I am having the same problem with my vehicle. This is the second time that I had to fix the touchscreen. Today I went to the dealership and it will cost me $1,300.00 to get it fixed. The dealership representative said, "this is a manufacturing defect and he does not know why Cadillac has not issued a recall." The spider cracks on the bottom left side of the touchscreen are affecting the A/C, heating controls, radio functions and the hands-free phone controls. Why should I pay for a manufacture defect? Can anyone please direct me to the right person/department at Cadillac to resolve this issue?*

*Thank you in advance, your help is appreciated.*

*Rudy Arredondo, Tx.*

d.  November 17, 2018:

i.  *My dealer said it was past 3 years, so they want $1500 to fix the cracked screen. I personally know 3 other Cadillac owners this*

41

*happened to. I even bought a 100,000-mile warranty but the Cadillac dealer sold me one that was not by GM. I only have 25k miles on my garaged XTS. This should be recall repair.]  [ I have my 2014 SRX at my dealership today and was told it would cost $1,060 to replace the cracked CUE screen. I keep my car parked in a garage both at home and work. With the volume of individuals who have this issue, the response by Cadillac is extremely disappointing. Unfortunately, I do not think I will invest in another Cadillac as a result.]*

ii. *Hi! Did you find a solution? I also have a 2014 with the webbing, my screen no longer works. So frustrating.*

5. ***GM's Knowledge of the Defect Through Customer Care Data and Vehicle Repair Data***

115.     GM was also made aware of the Defect based on the large number of repairs performed to the CUE System's exhibiting delamination and spider-webbing at its network of dealerships.

116.     In fact, with the introduction of the CUE System, GM announced a special customer care program with dedicated support staff trained with expertise on CUE Systems. For example, in this press release dated May 9, 2012, GM stated:

> Cadillac is launching CUE with training and support resources to enable dealers and customers to provide feedback, ask questions and access support in a number of ways. New customer care elements include:
>
> ****
>
> • Each U.S. Cadillac dealership has a trained technology expert to assist customers, providing a personal, local first line of contact during both the shopping and ownership experiences.

- Twenty-five new Connected Customer Experts are being deployed across the United States. to support the launch of CUE. These connectivity experts provide a resource for in-car electronic technological training, sales and service assistance.

- Cadillac's existing customer assistance services have added specific CUE experts to answer owner questions. Cadillac's customer assistance center in Austin, Texas, has specially selected and trained advisors who have expertise in infotainment and mobile devices to help answer questions.

- OnStar, standard on every Cadillac, will have a direct link to these CUE experts as well, for any owners with questions or wishing to provide feedback.

****

'We're blending the advanced technology of CUE with the personal touches of a luxury experience,' Butler said. 'We've built a thorough approach, enabling customers to give us feedback on the technology as they use it, as well as providing support for dealers and buyers who have questions.'[22]

117.    In addition to the above, on information and belief, GM regularly compiles and analyzes detailed service information regarding such repairs. Indeed, on information and belief, GM requires dealers to maintain detailed and meticulous records for any such repairs.

F.    **Plaintiffs' Experiences**

*Alabama Plaintiff Crystal Robinson (2014 Cadillac SRX)*

118.    Plaintiff Crystal Robinson is a resident of Birmingham, Alabama.

119.    On September 20, 2014, Ms. Robinson purchased a new 2014 Cadillac SRX from the Crest Cadillac, which is a franchised and authorized Cadillac dealership located in Birmingham, Alabama.

---

[22]    *See* GM press release, "Innovative Customer Care Comes With CUE Launch," dated May 9, 2012, available at: https://media.gm.com/media/us/en/gm/autoshows/detroit.detail.html/content/Pages/news/us/en/2012/May/0509_cue.html (last viewed September 9, 2019).

43

120.    As an authorized Cadillac dealership, Crest Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Crest Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

121.    Ms. Robinson still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Robinson, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Robinson purchased the vehicle but did not disclose it to her.  Ms. Robinson purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Ms. Robinson purchased her vehicle, Ms. Robinson would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Robinson. Like all Class Members, had Ms. Robinson known about the Defect, she would not have purchased the vehicle or would have paid less for it.

122.    In or around November 2016, Ms. Robinson, first noticed spider-webbing on the CUE touchscreen.

123.    As a result, Ms. Robinson took her vehicle to Crest Cadillac to be repaired.  Because the vehicle was still under the warranty, Cadillac replaced the defective CUE unit.

124.    Roughly a year and half after Crest Cadillac replaced the CUE unit, Ms. Robinson again noticed spider-webbing on the upper-right side of the CUE touchscreen.

125.    As a result, Ms. Robinson—again—returned to Crest Cadillac to have the CUE replaced.  Unfortunately, she was told by Crest Cadillac that because the vehicle was no longer under warranty, she would be required to spend over $1,000 to replace the CUE unit.

126.    Since Ms. Robinson first noticed the Defect in her second CUE unit, the spider-webbing has become worse and has covered more of the screen.

127.    In addition, Ms. Robinson has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

44

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands; and

- The navigation feature did not work.

128.    Moreover, Ms. Robinson paid for a subscription to Sirius XM, which is a satellite radio service available for use in her vehicle. Because Sirius XM was already programmed into her vehicle, Ms. Robinson is able to control 5-6 stations using the steering wheel. However, as a result of the Defect, Ms. Robinson is unable to listen to nearly all of the remaining Sirius stations, and she is therefore not receiving the benefit of her bargain.

129.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Robinson was unable to select the desired vents.

130.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Ms. Robinson could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE not been obscured by the Defect.

- While attempting to make or answer a call, Ms. Robinson had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Ms. Robinson had to repeatedly press the CUE scree, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

131.    Consequently, the Defect adversely affected Ms. Robinson's ability to concentrate and to drive safely.

132.    Ms. Robinson has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

133.    Before purchasing her vehicle, Ms. Robinson saw advertising materials concerning her vehicle and its various features.  Additionally, before her purchase, Ms. Robinson spoke with authorized dealership personnel regarding her vehicle equipped with the new CUE system. At the dealership, Ms. Robinson also test drove the vehicle with a dealership salesperson, who described the vehicle's features, including the features of the CUE system and how to operate the CUE.  Ms. Robinson also reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price.  Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Robinson of the existence of the Defect and/or the defective design prior to her purchase.  Similarly, none of the advertising materials Ms. Robinson reviewed contained any information concerning the Defect.

### *Alabama Plaintiff Richard Schellhammer (2014 Cadillac ATS)*

134.    In or around December 2015, Mr. Schellhammer purchased a used 2014 Cadillac ATS from Barkley Cadillac, which is a franchised and authorized Cadillac dealership located in Tuscaloosa, Alabama.

135.    As an authorized Cadillac dealership, Barkley Cadillac is one of GM's agents for sales and repairs.  GM's authorized dealerships, including Barkley Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

136.    Mr. Schellhammer still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the

Defect.  Unknown to Mr. Schellhammer, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Schellhammer purchased the vehicle but did not disclose it to him.  Mr. Schellhammer purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Mr. Schellhammer purchased his vehicle, Mr. Schellhammer would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Mr. Schellhammer.  Like all Class Members, had Mr. Schellhammer known about the Defect, he would not have purchased the vehicle or would have paid less for it.

137.    In or around June 2018, Mr. Schellhammer, first noticed spider-webbing on the CUE touchscreen.

138.    Since Mr. Schellhammer first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

139.    After first observing the spider-webbing, Mr. Schellhammer has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;

- The navigation feature did not work; and

- The backup camera did not work.

140.    Mr. Schellhammer's CUE has now completely stopped responding to his touch and has become completely unusable.

141.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Schellhammer is unable to select the desired vents.

142.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Mr. Schellhammer could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing his vehicle, Mr. Schellhammer was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to answer or make a call, Mr. Schellhammer had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While attempting to use the navigational feature in the CUE, Mr. Schellhammer had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

143.    Consequently, the Defect adversely affected Mr. Schellhammer's ability to concentrate and to drive safely.

144.    Plaintiff Schellhammer has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

145.    Before purchasing his vehicle, Mr. Schellhammer researched the Cadillac ATS model on Cadillac's webpage and saw multiple GM-authored advertising materials, on television and in print, concerning his vehicle and its various features.  Before purchasing his vehicle while at the authorized dealership, Mr. Schellhammer discussed his vehicle at length with authorized dealer personnel and reviewed the vehicle's window sticker, which listed the vehicle's features, options, and price.  Neither Defendant nor any of its agents, dealers, or other representatives

informed Mr. Schellhammer of the existence of the Defect and/or the defective design prior to his purchase. Similarly, none of the advertising materials Mr. Schellhammer reviewed contained any information concerning the Defect.

### *Florida Plaintiff William Braden (2014 Cadillac SRX)*

146.     Plaintiff William Braden is a resident of Hudson, Florida.

147.     On or around December 2014, Mr. Braden initially leased, then on or around December 2017 subsequently purchased, a 2014 Cadillac SRX from the Autonation Cadillac Port Richey, which is a franchised and authorized Cadillac dealership located in Port Richey, Florida.

148.     As an authorized Cadillac dealership, Autonation Cadillac Port Richey is one of GM's agents for sales and repairs.  GM's authorized dealerships, including Autonation Cadillac Port Richey, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

149.     Mr. Braden still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Braden, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Braden purchased the vehicle but did not disclose it to him.  Mr. Braden purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Mr. Braden purchased his vehicle, Mr. Braden would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Mr. Braden.  Like all Class Members, had Mr. Braden known about the Defect, he would not have purchased the vehicle or would have paid less for it.

150.     In or around June 2018, Mr. Braden, first noticed spider-webbing on the lower-right side of the CUE touchscreen.

151.     Since Mr. Braden first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

152.    After first observing the spider-webbing, Mr. Braden has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

153.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Braden was unable to select the desired vents.

154.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Mr. Braden could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.
- While attempting to make or answer a call, Mr. Braden had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.
- While attempting to use the navigational feature in the CUE, Mr. Braden had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

155.    Consequently, the Defect adversely affected Mr. Braden's ability to concentrate and to drive safely.

156. Mr. Braden has suffered an ascertainable loss as a result Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

157. Before purchasing his vehicle, Mr. Braden saw multiple GM-authored television advertisements and print advertisements from Autonation Cadillac Port Richey concerning his vehicle and its various features. Additionally, before his purchase, Mr. Braden spoke with authorized dealership personnel regarding his vehicle equipped with the new CUE system. At the dealership, Mr. Braden also test drove the vehicle with a dealership salesperson. In addition, Mr. Braden reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Braden of the existence of the Defect and/or the defective design prior to his purchase. Similarly, none of the advertising materials Mr. Braden reviewed contained any information concerning the Defect.

### *Florida Plaintiff Earl Kladke (2016 Cadillac SRX)*

158. Plaintiff Earl Kladke is a resident of Lakeview, New York.

159. On January 4, 2016, Mr. Kladke purchased a new 2016 Cadillac SRX from Plaza Cadillac, which is a franchised and authorized Cadillac dealership located in Leesburg, Florida.

160. As an authorized Cadillac dealership, Plaza Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Plaza Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

161. Mr. Kladke still owns his vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Kladke, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Kladke purchased the vehicle but did not disclose

it to him.  Mr. Kladke purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Mr. Kladke purchased his vehicle, Mr. Kladke would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Mr. Kladke. Like all Class Members, had Mr. Kladke known about the Defect, he would not have purchased the vehicle or would have paid less for it.

162.    In or around May 2019, Mr. Kladke, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

163.    Since Mr. Kladke first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

164.    After first observing the spider-webbing, Mr. Kladke has experienced the following problems—sometimes on numerous occasions—as a result of the CUE Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

165.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Kladke was unable to select the desired vents.

166.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Mr. Kladke could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

52

- While reversing his vehicle, Mr. Kladke was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Mr. Kladke had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Mr. Kladke had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

167.    Consequently, the Defect adversely affected Mr. Kladke's ability to concentrate and to drive safely.

168.    The State of New York makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $200 for first-time offenders.

169.    Mr. Kladke has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

170.    Before purchasing his vehicle, Mr. Kladke saw advertising materials concerning his vehicle and its various features.  Additionally, before his purchase, Mr. Kladke spoke with authorized dealership personnel regarding his vehicle equipped with the new CUE system.  At the dealership, Mr. Kladke also test drove the vehicle with a dealership salesperson, who described the vehicle's features, including the features of the CUE system and how to operate the CUE.  In addition, Mr. Kladke reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Kladke of the existence of the Defect and/or the defective design

prior to his purchase. Similarly, none of the advertising materials Mr. Kladke reviewed contained any information concerning the Defect.

***Florida Plaintiff Joseph Palopoli, Jr. (2017 Cadillac ATS)***

171.    Plaintiff Joseph Palopoli, Jr. is a resident of Coral Springs, Florida.

172.    Plaintiff Palopoli purchased a new 2017 Cadillac ATS in or about July 2018 from the Ed Morse Cadillac dealership, which is a franchised and authorized Cadillac dealership located in Sunrise, Florida.  Prior to purchase of the vehicle, Mr. Palopoli went to the Ed Morse Dealership showroom to look at Cadillac models.  Plaintiff worked with one salesperson who took him for a test drive and explained the CUE system to him in detail including its functions and how to use it.  Mr. Palopoli also read the Monroney window sticker prior to purchase of the vehicle, including the information about the CUE screen and system which did not contain any information about the Defect or a potential defect.  Plaintiff Palopoli made his decision to purchase his vehicle based on the test drive, and representations made by Defendant. Had Mr. Palopoli known about the Defect, he would not have purchased the vehicle or would have paid less for it.

173.    Mr. Palopoli still owns his vehicle.  Within days of his purchase of the vehicle, the vehicle's CUE touchscreen exhibited cracks or spider-webbing.  Mr. Palopoli immediately went to dealership and they replaced the CUE with another CUE. Unknown to Mr. Palopoli, the CUE had the Defect at the time he purchased his vehicle as did the replacement CUE. Defendant knew about the Defect at the time Mr. Palopoli purchased the vehicle but did not disclose it to him. Mr. Palopoli purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.

174.    In or around June 2019, Mr. Palopoli's CUE stopped responding and became inoperable when he had his mobile device plugged into the charger.

175.    Before the CUE became inoperable, Mr. Palopoli experienced the following Problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;

- His mobile device would freeze up during calls;

- He was unable to make phone calls, and/or receive or send texts;

- The navigation feature did not work; and

- The backup camera did not work.

176.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Palopoli was unable to select the desired vents.

177.    One of the reasons Mr. Palopoli purchased the vehicle was because of its rear-view camera.  However, the camera in his vehicle does not work when the CUE becomes frozen as a result of the Defect.

178.    Effective July 1, 2019, it became illegal in Florida, while driving, to do anything that involves "manually typing or entering multiple letters, numbers, symbols or other characters into a wireless communications device or while sending or reading data on such a device for the purpose of nonvoice interpersonal communication".   In addition, on October 1, 2019, it became illegal in Florida to talk on a cellphone without a hands-free device in all school zones and construction zones where workers are present, the violation of which is a fine of not less than $30 for first-time offenders and not less than $60 for second-time offenders.

179.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

180.    Mr. Palopoli has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

181.    Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Palopoli of the existence of the Defect and/or the defective design prior to his purchase.

182.    In addition, on two occasions, during the period in or about August 2018 through December 2018, when Plaintiff Palopoli brought his vehicle into a Cadillac dealership to seek to have the Cue system repaired, once at the Ed Morse dealership in Sunrise, Florida and once at a dealership in Delray Beach, Florida, the service representatives at each of the two dealerships acknowledged to Plaintiff that Defendant General Motors was aware of the problem and the dealership had seen a number of the failed units.

### *Florida Plaintiff Lana Savage (2013 Cadillac SRX)*

183.    In or around July 2013, Plaintiff Lana Savage purchased a new 2013 Cadillac SRX from Premier Cadillac (now Fields Cadillac St. Augustine), a GM authorized Cadillac dealership in St. Augustine, Florida. Her vehicle was equipped with a CUE System.

184.    As an authorized Cadillac dealership, Premier Cadillac (now Fields Cadillac St. Augustine) was one of GM's agents for sales and repairs. GM's authorized dealerships, including Premier Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

185.    Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

186.    The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

187.    Passenger safety, vehicle performance, and reliability were all factors in Plaintiff Savage's decision to purchase the vehicle. Before purchasing her Class Vehicle, Savage reviewed the Cadillac SRX webpage on the authorized dealer's website. At the authorized dealership and before purchase, Savage also reviewed the Monroney sticker and sales brochures about the vehicle, test drove the vehicle, and discussed the vehicle and its CUE system with the authorized dealer representative, who gave Savage a short demonstration of how to operate the CUE system and its benefits. As discussed *supra*, GM could and should have disclosed the existence of the Defect in these materials and directed its authorized dealership salespeople to disclose the Defect.

188.    At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

189.    In 2015, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction by becoming unresponsive to Plaintiff's touch.

190.    On or about July 23, 2015, with approximately 33,697 miles on the odometer, Plaintiff took her vehicle to Fields Cadillac, an authorized Cadillac dealer, complaining that the CUE System touchscreen was cracked and unresponsive. According to Plaintiff's repair records, the dealership technicians confirmed that they "found that CUE screen was cracked[.]" They subsequently "ordered [a] new unit and installed [a] new unit." However, this did not resolve the Defect.

191.    Approximately one year later, the CUE System touch screen again cracked and became unresponsive. Plaintiff's husband returned to the Cadillac dealership to request repairs, but the repair technicians informed him that the repairs would not be covered. The repair technicians further estimated the cost of replacement at $1,200, which Plaintiff would have to pay at her own expense.

192.    GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to remain cracked and completely unresponsive.

193.    The Defect and its many deleterious consequences have created unsafe driving conditions.

194.    Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to her purchase.

195.    Had GM disclosed its knowledge of the Defect before Plaintiff purchased her 2013 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased her 2013 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

196.    At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *Indiana Plaintiff April Bradley (2013 Cadillac SRX)*

197.    Plaintiff April Bradley is a resident of Bloomington, Indiana.

198.    In or around September 2013, Ms. Bradley purchased a new 2013 Cadillac SRX from Curry Buick Cadillac, which is a franchised and authorized Cadillac dealership located in Bloomington, Indiana.

199.    As an authorized Cadillac dealership, Curry Buick Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Curry Buick Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

200.    Ms. Bradley still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Bradley, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Bradley purchased the vehicle but did not disclose it to her. Ms. Bradley purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had GM disclosed its knowledge of the Defect before Ms. Bradley purchased her vehicle, Ms. Bradley would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Bradley. Like all Class Members, had Ms.

Bradley known about the Defect, she would not have purchased the vehicle or would have paid less for it.

201.    In or around April 2019, Ms. Bradley, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

202.    Since Ms. Bradley first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

203.    After first observing the spider-webbing, Ms. Bradley has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;

- The navigation feature did not work; and

- The backup camera did not work.

204.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Bradley was unable to select the desired vents.

205.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Ms. Bradley could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing her vehicle, Ms. Bradley was unable to see properly because of the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Ms. Bradley had to repeatedly press the CUE screen, which caused her to become distracted and to divert her

eyes from the road for a longer period of time than had the CUE screen been functioning properly.

206.    Consequently, the Defect adversely affected Ms. Bradley's ability to concentrate and to drive safely.

207.    This is not the first time Ms. Bradley has experienced the Defect.    On a prior occasion, the CUE in her vehicle spider-webbed and was replaced under warranty.    However, after the current CUE in her vehicle spider-webbed, Ms. Bradley complained to the dealership and Defendant.    After much back and forth, Defendant agreed to cover some of the cost of the replacement CUE, yet Ms. Bradley still had to pay $162 to replace the CUE.

208.    Ms. Bradley has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

209.    Before purchasing her vehicle, Ms. Bradley saw advertising materials concerning her vehicle and its various features.    Additionally, before her purchase, Ms. Robinson spoke with authorized dealership personnel regarding her vehicle equipped with the new CUE system, who described the vehicle's features, including touting the features of the CUE system.    At the dealership, Ms. Robinson also test drove the vehicle and reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price..    Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Bradley of the existence of the Defect and/or the defective design prior to her purchase.    Similarly, none of the advertising materials Ms. Bradley reviewed contained any information concerning the Defect.

### *Kansas Plaintiff John Toda (2014 Cadillac ATS)*

210.    Plaintiff John Toda is a resident of Tecumseh, Kansas.

211.    On May 5, 2017, Mr. Toda purchased a used 2014 Cadillac ATS from the Doug Richter Cadillac Dealership, which is a franchised and authorized Cadillac dealership located in Topeka, Kansas.

212.    As an authorized Cadillac dealership, Doug Richter Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Doug Richter Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

213.    Mr. Toda still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Toda, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Toda purchased the vehicle but did not disclose it to him.  Mr. Toda purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Mr. Toda purchased his vehicle, Mr. Toda would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Mr. Toda. Like all Class Members, had Mr. Toda known about the Defect, he would not have purchased the vehicle or would have paid less for it.

214.    In or around February 2019, Mr. Toda, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

215.    Since Mr. Toda first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

216.    After first observing the spider-webbing, Mr. Toda has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

217.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Toda was unable to select the desired vents.

218.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Mr. Toda could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.
- While reversing his vehicle, Mr. Toda was unable to see properly because the backup camera was obscured by the Defect.
- While attempting to make or answer a call, Mr. Toda had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.
- While attempting to use the navigational feature in the CUE, Mr. Toda had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

219.    Consequently, the Defect adversely affected Mr. Toda's ability to concentrate and to drive safely.

220.    Mr. Toda has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

221.    Before purchasing his vehicle, Mr. Toda saw advertising materials concerning his vehicle and its various features.  At the dealership, Mr. Toda also test drove the vehicle.  Neither

Defendant nor any of its agents, dealers, or other representatives informed Mr. Toda of the existence of the Defect and/or the defective design prior to his purchase. Similarly, none of the advertising materials Mr. Toda reviewed contained any information concerning the Defect.

***Maryland Plaintiff Maxine Glenn (2016 Cadillac SRX)***

222.    Plaintiff Maxine Glenn is a resident of Waldorf, Maryland.

223.    In or around July 2016, Ms. Glenn purchased a new Cadillac SRX from the Waldorf Chevrolet Cadillac, which is a franchised and authorized Cadillac dealership located in Waldorf, Maryland.

224.    As an authorized Cadillac dealership, Waldorf Chevrolet Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Waldorf Chevrolet Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

225.    Ms. Glenn still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Glenn, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Glenn purchased the vehicle but did not disclose it to her. Ms. Glenn purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Ms. Glenn purchased her vehicle, Ms. Glenn would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Glenn. Like all Class Members, had Ms. Glenn known about the Defect, she would not have purchased the vehicle or would have paid less for it.

226.    In or around April 2019, Ms. Glenn, first noticed spider-webbing on the CUE touchscreen.

227.    Since Ms. Glenn first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

228.    After first observing the spider-webbing, Ms. Glenn has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;

- The navigation feature did not work; and

- The backup camera did not work.

229.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Glenn was unable to select the desired vents.

230.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.  For example:

- Ms. Glenn could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing her vehicle, Ms. Glenn was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Ms. Glenn had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Ms. Glenn had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

231.    Consequently, the Defect adversely affected Ms. Glenn's ability to concentrate and to drive safely.

232.    The State of Maryland makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $75 for first-time offenders.

233.    Ms. Glenn has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

234.    Before purchasing her vehicle, Ms. Glenn saw advertising materials concerning her vehicle and its various features, including GM-authored television commercials.  Additionally, before her purchase, Ms. Glenn spoke with authorized dealership personnel regarding her vehicle equipped with the new CUE system. At the dealership, Ms. Glenn also test drove the vehicle with a dealership salesperson, who described the vehicle's features, including the features of the CUE system and how to operate the CUE.  In addition, Ms. Glenn reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price.  Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Glenn of the existence of the Defect and/or the defective design prior to her purchase.  Similarly, none of the advertising materials Ms. Glenn reviewed contained any information concerning the Defect.

***Michigan Plaintiff Nicole Blanchard (2013 Cadillac SRX)***

235.    Plaintiff Nicole Blanchard ("Blanchard") is a citizen and resident of Michigan.

236.    In May 2018, Blanchard bought a used 2013 Cadillac SRX, manufactured by GM and equipped with the defective CUE system, from Don Nester Chevy in Houghton Lake, Michigan.  Blanchard uses her vehicle for personal, family, and/or household purposes.  Blanchard further uses her vehicle in a foreseeable manner and in the manner in which the vehicle was intended.

237.    Before purchasing her vehicle, GM did not disclose the Defect, nor did Blanchard have knowledge of the Defect.  To date, GM has failed to adequately disclose the Defect to Blanchard.

238.    In or around June/July 2019, Blanchard's CUE system stopped responding and became inoperable from the touchscreen.  Blanchard notices the following problems: the CUE touchscreen became entirely unresponsive; features became inaccessible, including climate control and navigation.  Blanchard attempted a factory reset, which did not resolve the problems.

239.    In August 2019, Blanchard reported the problems to GM Infotainment Group via email. However, it did not respond.

240.    In September 2019, Blanchard followed-up with a telephone call.  GM Infotainment Group informed Blanchard that there was no recall and offered her $100.00, which she declined. GM Infotainment Group also informed Blanchard that the repairs to the CUE system would cost over a thousand dollars.

241.    Since there is no way for Ms. Blanchard to control the temperature in her vehicle and with winter fast approaching in Michigan, as well as the inability to use the navigation feature for her upcoming trips, Blanchard had no choice but to take her vehicle back to Don Nester Chevy to have the CUE replaced for $1,500.00.

242.    She has suffered an ascertainable loss as a result of GM's representations and omissions with respect to and concealment of the Defect, breach of express and implied warranties, and violation of various consumer protection laws, including, but not limited to, paying more for the vehicle than it was worth, diminished value of her Class Vehicle, loss of use, and current and future repairs.

243.    Had GM or any of its agents, dealers, or other representatives informed Blanchard of the existence of the Defect and/or the defective design prior to her purchase, Blanchard would have seen such disclosures and been aware of them.  Blanchard would not have purchased her 2013 Cadillac SRX, or would have paid less, had she known that the CUE system suffers from the Defect.

244.    Ms. Blanchard has owned GM vehicles since she was 16 years old and based her purchase decision on brand loyalty.

### *Michigan Plaintiff Gladys Tubbs (2014 Cadillac SRX)*

245.    On or about September 2014, Plaintiff Gladys Tubbs purchased a new 2014 Cadillac SRX from Stan Lassen Cadillac (now Superior Cadillac), which was an authorized Cadillac dealership in in Battle Creek, Michigan. Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

246.    As an authorized Cadillac dealership, Stan Lassen Cadillac (now Superior Cadillac) was one of GM's agents for sales and repairs. GM's authorized dealerships, including Stan Lassen Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

247.    The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

248.    Passenger safety, vehicle performance, and reliability were all factors in Plaintiff Tubbs's decision to purchase the vehicle. Before purchasing her Class Vehicle, Tubbs discussed the vehicle and its CUE system with the authorized dealer representative. As discussed *supra*, GM could and should have disclosed the existence of the Defect in these materials and directed its authorized dealership salespeople to disclose the Defect.

249.    At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

250.    In 2018, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction by becoming unresponsive to Plaintiff's touch. Plaintiff was unable to control the temperature in her vehicle or use Bluetooth-paired devices.

251.    On or about June 21, 2019, with approximately 43,905 miles on the odometer, Plaintiff took her vehicle to Superior Cadillac, an authorized Cadillac dealer, complaining that the CUE System touchscreen was completely unresponsive. According to Plaintiff's repair records, she reported that the CUE System was webbing, and dealership technicians "replace[d] the display assembly." However, the dealership invoiced her for both labor and parts totaling $1,396.36, eventually reducing the amount Plaintiff paid out-of-pocket to $1,191.12 by applying a "coupon" discount.

252.    GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to manifest or will manifest cracking, bubbling, delaminating, spider-webbing, or malfunctioning.

253.    The Defect and its many deleterious consequences have created unsafe driving conditions.

254.    Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to her purchase.

255.    Had GM disclosed its knowledge of the Defect before Plaintiff purchased her 2014 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased his 2014 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

256.    At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *New Jersey Plaintiff Tonya Gruchacz (2014 Cadillac ATS)*

257.    Plaintiff Tonya Gruchacz purchased a new 2014 Cadillac ATS from the Flemington Cadillac dealership in Flemington, NJ on August 7, 2013 for approximately $50,000.  The vehicle included a CUE System display that GM marketed to Plaintiff and all Class and Subclass Members as providing the "innovative brilliance of your tablet to your entire driving experience…right at your fingertips."[23]

258.    Indeed, prior to the purchase of the vehicle, Ms. Gruchacz went to the Flemington Cadillac Dealership on two separate occasions to look at Cadillac models.  Both times, she test drove the Cadillac ATS.  During her test drives, the Flemington Cadillac Dealership representative explained the CUE system to her including its functions and how to use it.  Plaintiff Gruchacz made her decision to purchase her vehicle based on the test drive and representations from the salesperson.

259.    Based on these representations, Plaintiff reasonably assumed that with a price tag of approximately $50,000, the vehicle she purchased would come with the CUE System that provided the state-of-the-art touch screen technology GM marketed, and that GM was not selling the vehicle with any known defects.

260.    In late 2016, or early 2017, while her vehicle was still within the 4-year, 50,000-mile warranty period, Plaintiff's CUE System touch screen became unresponsive.  Shortly after, Plaintiff called Flemington Cadillac to report the issue.  The representative at Flemington Cadillac said the Defect was not covered under warranty because the vehicle was now out of the warranty. Despite the fact that Defendant had issued two bulletins regarding the Defect, and both were issued during the warranty period, Plaintiff was told she would have to pay GM about $1,200 to have the CUE System repaired.

261.    In or around July 2017, the CUE System screen of Plaintiff's vehicle suddenly appeared cracked or shattered.  It was still unresponsive to touch.

---

[23] *See 2014 Cadillac ATS Marketing Brochure* at 26.

262.    Within one week of noticing that the screen appeared cracked, Plaintiff called the Cadillac Flemington dealership service department to report the issue. Without even seeing the vehicle, the service department representative indicated he knew exactly the issue Plaintiff was experiencing. Despite having notice of the Defect, the GM representative told Plaintiff that because the vehicle was out of warranty, the cost for GM to repair the Defect was $1,200.

263.    On March 1, 2018, Ms. Gruchacz brought her vehicle to Flemington Cadillac for an unrelated recall. At that time, she informed them again that the CUE System screen appeared shattered and was not responding to touch. The Flemington Cadillac dealer service representative informed Ms. Gruchacz that they "see this issue all the time…the screen is not cracked, it's the laminate." Despite admitting that the issue Ms. Gruchacz was experiencing with her CUE System screen is a common problem, Flemington Cadillac estimated it would cost Plaintiff $1,053.58 to repair the CUE System screen.

264.    To date, GM has refused to repair Plaintiff's CUE System unless she pays them no less than $1,053.58 plus tax. Thus, Plaintiff's CUE System still suffers from the Defect.

### New Jersey Plaintiff Robert Tyson (2014 Cadillac ATS)

265.    Plaintiff Robert Tyson ("Tyson") is a citizen and resident of the state of New Jersey.

266.    In March 2017, Tyson bought a used 2014 Cadillac ATS, manufactured by GM and equipped with the defective CUE system, from rom Automotive Avenues, in Wall, New Jersey. Tyson uses his Class Vehicle for personal, family, and/or household purposes. Tyson further uses his Class Vehicle in a foreseeable manner and in the manner in which the vehicle was intended.

267.    Before purchasing his Class Vehicle, GM did not disclose the Defect, nor did Tyson have knowledge of the Defect. To date, GM has failed to adequately disclose the Defect to Tyson.

268.    In February 2018, Tyson's CUE system stopped responding and became inoperable from the touchscreen. Tyson noticed the following problems: the CUE touchscreen became entirely unresponsive; the climate control did not work; the navigation did not work; the Bluetooth stopped working, including the inability to pair his smartphone through the CUE system, resulting

in the loss of use of his smartphone through the CUE system; and all other settings that require the use of the touchscreen also stopped working.

269.    Shortly thereafter, Tyson reported the problems to GM, including two GM Cadillac dealerships, Crown Cadillac and Open Road Cadillac, both located in New Jersey. They advised to have his vehicle diagnosed for $150.00, which Tyson declined. Tyson was also informed that the repairs to the CUE system would cost around $1,500.00.  Since Tyson's vehicle was out of warranty, Tyson would be required to pay for this repair out-of-pocket. He was further informed that GM did not consider the problems he experienced a safety issue.  As a result, GM refused to replace Tyson's defective CUE system.

270.    In August 2019, Tyson noticed cracking or spider-webbing formations on the bottom-right side of the CUE touchscreen.

271.    Tyson still owns his vehicle, which continues to exhibit the problems he reported to GM and the dealerships.  He has suffered an ascertainable loss as a result of GM's representations and omissions with respect to and concealment of the Defect, breach of express and implied warranties, and violation of various consumer protection laws, including, but not limited to, paying more for the vehicle than it was worth, diminished value of his vehicle, loss of use, and future repairs.

272.    Had GM or any of its agents, dealers, or other representatives informed Tyson of the existence of the Defect and/or the defective design prior to his purchase, Tyson would have seen such disclosures and been aware of them.  Tyson would not have purchased his 2014 Cadillac ATS, or would have paid significantly less, had he known that the CUE system suffers from the Defect.

273.    Before purchasing his vehicle, Tyson saw the Monroney sticker and advertising material concerning his vehicle and its various features, including the CUE system.  The Monroney sticker and the advertising material Tyson reviewed did not contain any information concerning the Defect.

71

### New York Plaintiff Katrina Howard (2013 Cadillac SRX)

274.    Plaintiff Katrina Howard ("Howard") is a citizen and resident of New York.

275.    In November 2012, Howard purchased a new 2013 Cadillac SRX, manufactured by GM and equipped with the defective CUE system, from Valley Cadillac in Rochester, New York.  Valley Cadillac is an authorized GM dealer.

276.    Howard uses her vehicle for personal, family, and/or household purposes.  Howard further uses her vehicle in a foreseeable manner and in the manner in which the vehicle was intended.

277.    Before purchasing her vehicle, GM did not disclose the Defect, nor did Howard have knowledge of the Defect.  To date, GM has failed to adequately disclose the Defect to Howard.

278.    In or around 2015/2016, Howard noticed her CUE system stopped responding and became inoperable from the touchscreen.  Howard experienced the following problems: the CUE touchscreen worked periodically; the air conditioning did not work; and the radio did not work properly. Howard also noticed cracking and spider-webbing formations.

279.    Shortly thereafter, she contacted Valley Cadillac, the dealership where she purchased her vehicle, and GM replaced the CUE system under warranty. However, in or around Spring 2018, Howard started experiencing the same problems with the CUE system as outlined above.  The second time, Ms. Howard also experienced bubbling on the CUE screen.

280.    Howard still owns her vehicle and her vehicle continues to exhibit the problems as discussed above.  She has suffered an ascertainable loss as a result of GM's representations and omissions with respect to and concealment of the Defect, breach of express and implied warranties, and violation of various consumer protection laws, including, but not limited to, paying more for the vehicle than it was worth, diminished value of her Class Vehicle, loss of use, and future repairs.

281.    Had GM or any of its agents, dealers, or other representatives informed Howard of the existence of the Defect and/or the defective design prior to her purchase, Howard would have

seen such disclosures and been aware of them. Howard would not have purchased her 2013 Cadillac SRX, or would have paid less, had she known that the CUE system suffers from the Defect.

282.    Before purchasing her vehicle, Howard saw the Monroney sticker concerning her vehicle and its various features, including the CUE system. The Monroney sticker Howard reviewed did not contain any information concerning the Defect.

### *North Carolina Plaintiff Sheila Cauthen (2013 Cadillac SRX)*

283.    Plaintiff Sheila Cauthen is a resident of Greensboro, North Carolina.

284.    In or around December 2016, Ms. Cauthen purchased a 2013 Cadillac SRX certified pre-owned from the Hendrick Cadillac Southpoint, which is a franchised and authorized Cadillac dealership located in Durham, North Carolina.

285.    As an authorized Cadillac dealership, Hendrick Cadillac Southpoint is one of GM's agents for sales and repairs. GM's authorized dealerships, including Hendrick Cadillac Southpoint, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

286.    Ms. Cauthen still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Cauthen, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Cauthen purchased the vehicle but did not disclose it to her. Ms. Cauthen purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had GM disclosed its knowledge of the Defect before Ms. Cauthen purchased her vehicle, Ms. Cauthen would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Cauthen. Like all Class Members, had Ms. Cauthen known about the Defect, she would not have purchased the vehicle or would have paid less for it.

287.    In or around May 2019, Ms. Cauthen, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

288.    Since Ms. Cauthen first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

289.    After first observing the spider-webbing, Ms. Cauthen has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

290.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Cauthen was unable to select the desired vents.

291.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Ms. Cauthen could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to divert her eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.
- While reversing her vehicle, Ms. Cauthen was unable to see properly because the backup camera was obscured by the Defect.
- While attempting to make or answer a call, Ms. Cauthen had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Ms. Cauthen had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

292.    Consequently, the Defect adversely affected Ms. Cauthen's ability to concentrate and to drive safely.

293.    Ms. Cauthen has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

294.    Before purchasing her vehicle, Ms. Cauthen saw advertising materials concerning her vehicle and its various features.  Additionally, before her purchase, Ms. Cauthen spoke with authorized dealership personnel regarding her vehicle equipped with the new CUE system. At the dealership, Ms. Cauthen also test drove the vehicle with a dealership salesperson, who described the vehicle's features, including the features of the CUE system and how to operate the CUE. Moreover, the dealership salesperson had Ms. Cauthen stop the vehicle by the roadside during the test drive to focus on the CUE system's features.  Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Cauthen of the existence of the Defect and/or the defective design prior to her purchase.  Similarly, none of the advertising materials Ms. Cauthen reviewed contained any information concerning the Defect.

### *North Carolina Plaintiff Lorenzo Macaisa (2013 Cadillac ATS)*

295.    Plaintiff Mariano Lorenzo Macaisa is a resident of Raleigh, North Carolina.

296.    On April 11, 2019, Mr. Macaisa purchased a used 2013 Cadillac ATS from Auction Direct USA located in Raleigh, North Carolina.

297.    Mr. Macaisa still owns his vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the

Defect. Unknown to Mr. Macaisa, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Macaisa purchased the vehicle but did not disclose it to him. Mr. Macaisa purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable. Had Mr. Macaisa known about the Defect, he would not have purchased the vehicle or would have paid less for it.

298.    In or around June 2019, Mr. Macaisa, first noticed spider-webbing on the CUE touchscreen.

299.    Since Mr. Macaisa first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

300.    After first observing the spider-webbing, Mr. Macaisa has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

301.    Mr. Macaisa's CUE has now completely stopped responding to his touch and has become entirely unusable.

302.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, Mr. Macaisa is unable to select the desired vents.

303.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Mr. Macaisa could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing his vehicle, Mr. Macaisa was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Mr. Macaisa had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Mr. Macaisa had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

304.    Consequently, the Defect adversely affected Mr. Macaisa's ability to concentrate and to drive safely.

305.    Mr. Macaisa has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

306.    Before purchasing his vehicle, Mr. Macaisa saw advertising materials concerning his vehicle and its various features.  In addition, Mr. Macaisa discussed his vehicle with a salesperson. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Macaisa of the existence of the Defect and/or the defective design prior to his purchase. Similarly, none of the advertising materials Mr. Macaisa reviewed contained any information concerning the Defect.

### *Texas Plaintiff Gini Michelle Cox (2013 Cadillac ATS)*

307.    Plaintiff Gini Michelle Cox is a resident of Midland, Texas.

308.    On March 31, 2014, Ms. Cox purchased a new 2013 Cadillac ATS sedan from the Midland Cadillac, which is a franchised and authorized Cadillac dealership located in Midland, Texas.

309.    As an authorized Cadillac dealership, Midland Cadillac is one of GM's agents for sales and repairs. GM's authorized dealerships, including Midland Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

310.    Ms. Cox still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Cox, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Cox purchased the vehicle but did not disclose it to her.  Ms. Cox purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Ms. Cox purchased her vehicle, Ms. Cox would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Ms. Cox. Like all Class Members, had Ms. Cox known about the Defect, she would not have purchased the vehicle or would have paid less for it.

311.    In or around November 2018, Ms. Cox, first noticed spider-webbing on the lower-left side of the CUE touchscreen.

312.    Since Ms. Cox first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

313.    After first observing the spider-webbing, Ms. Cox has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

78

314.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Cox was unable to select the desired vents.

315.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions. For example:

- Ms. Cox could not clearly see the CUE screen while driving because of the spiderwebbing, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing her vehicle, Ms. Cox was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Ms. Cox had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Ms. Cox had to repeatedly press the CUE screen, which caused her to become distracted and to divert her eyes from the road for a longer period of time than had the CUE screen been functioning properly.

316.    Consequently, the Defect adversely affected Ms. Cox's ability to concentrate and to drive safely.

317.    Ms. Cox has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

318.    Before purchasing her vehicle, Ms. Cox saw advertising materials concerning her vehicle and its various features.  Additionally, before her purchase, Ms. Cox spoke with authorized

dealership personnel regarding her vehicle equipped with the new CUE system  In addition, Ms. Cox reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price.  Neither Defendant, nor any of its agents, dealers, or other representatives informed Ms. Cox of the existence of the Defect and/or the defective design prior to her purchase. Similarly, none of the advertising materials Ms. Cox reviewed contained any information concerning the Defect.

### *Texas Plaintiff Kendra Piazza (2015 Cadillac SRX)*

319.    In or about December 2015, Plaintiff Kendra Piazza purchased a new 2015 Cadillac SRX from Garland Cadillac, a GM authorized Cadillac dealership in Garland, Texas. Her vehicle was equipped with a CUE System.

320.    As an authorized Cadillac dealership, Garland Cadillac was one of GM's agents for sales and repairs. GM's authorized dealerships, including Garland Cadillac, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

321.    Plaintiff purchased her vehicle primarily for personal, family, or household use. GM manufactured, sold, distributed, advertised, marketed, and warranted the vehicle.

322.    The express written warranty was a material factor in Plaintiff's decision to purchase the vehicle.

323.    Passenger safety, vehicle performance, and reliability were all factors in Plaintiff Piazza's decision to purchase the vehicle. Before purchasing her Class Vehicle, Piazza researched the vehicle online and reviewed the Cadillac SRX webpage on Cadillac's website and the authorized dealer's website. At the authorized dealership and before purchase, Piazza also test drove the vehicle and discussed the vehicle and its CUE system with the authorized dealer representative, who extolled the benefits of the CUE system and gave Piazza a demonstration of how to operate it. As discussed *supra*, GM could and should have disclosed the existence of the Defect in these materials and directed its authorized dealership salespeople to disclose the Defect.

324.    At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Plaintiff, at the time she purchased her vehicle, the CUE had the Defect. GM knew about the Defect at the time Plaintiff purchased the vehicle but did not disclose it to her. Plaintiff purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Plaintiff known about the Defect, she would not have purchased the vehicle or would have paid less for it.

325.    In or around August 2016, the CUE touchscreen of Plaintiff's vehicle began to crack and malfunction.

326.    On or about August 12, 2016, with approximately 5,896 miles on the odometer, Plaintiff took her vehicle to an authorized Cadillac dealer, complaining that the CUE entertainment System was malfunctioning. According to Plaintiff's repair records, she reported that the CUE System was "intermittently freezing up," and dealership technicians "replace[d] the center CUE radio control display" due to an "internal failure in CUE central radio display." However, this did not resolve the Defect.

327.    In or around June 2019, Plaintiff's CUE System malfunctioned again. On or about June 20, 2019, with approximately 24,042 miles on the odometer, Plaintiff took her vehicle back to an authorized Cadillac dealer due to the CUE System malfunction. According to Plaintiff's repair records, she reported that the "CUE System [was] freezing up on lower button" and unresponsive. Again, dealership technicians "replace[d] the center CUE radio control display" due to an "internal failure in CUE central radio display." However, this did not resolve the Defect.

328.    GM's authorized dealership has failed to adequately repair Plaintiff's vehicle by replacing the defective CUE Systems with equally defective CUE Systems. Despite these repair attempts by GM and its dealers, Plaintiff's CUE System touchscreen continues to manifest or will manifest cracking, bubbling, delaminating, spider-webbing, or malfunctioning.

329.    The Defect and its many deleterious consequences have created unsafe driving conditions.

330.    Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff of the existence of the Defect and/or the defective design prior to her purchase.

331.    Had GM disclosed its knowledge of the Defect before Plaintiff purchased her 2015 Cadillac SRX, Plaintiff would have seen such disclosures and been aware of them. Indeed, GM's omissions were material to Plaintiff. Like all Class Members, Plaintiff would not have purchased her 2015 Cadillac SRX, or would not have paid the purchase price charged by GM, had she known that the CUE System touchscreens are prone to cracking, bubbling, delaminating, and spider-webbing, causing the System to malfunction.

332.    At all times, Plaintiff, like all Class Members, has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

### *West Virginia Plaintiff David Conroe (2013 Cadillac XTS)*

333.    Plaintiff David Conroe is a resident of Bunker Hill, West Virginia.

334.    On May 5, 2018, Mr. Conroe purchased a used 2013 Cadillac XTS from Opequon Motors which is a franchised and authorized Cadillac dealership located in Martinsburg, West Virginia.

335.    As an authorized Cadillac dealership, Opequon Motors is one of GM's agents for sales and repairs.  GM's authorized dealerships, including Opequon Motors, were not intended to be the ultimate consumers of the class vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers.

336.    Mr. Conroe still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Conroe, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Conroe purchased the vehicle but did not disclose it to him.  Mr. Conroe purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had GM disclosed its knowledge of the Defect before Mr. Conroe purchased his vehicle, Mr. Conroe would have seen such disclosures and been aware of

them. Indeed, GM's omissions were material to Mr. Conroe. Like all Class Members, had Mr. Conroe known about the Defect, he would not have purchased the vehicle or would have paid less for it.

337.    In or around May 2019, Mr. Conroe, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

338.    On July 29, 2019, Mr. Conroe brought his vehicle back to Opequon Motors to have his CUE inspected. Opequon Motors told Mr. Conroe that because the warranty period covering his vehicle had expired, it would cost Mr. Conroe $1,544.00 to replace the CUE.

339.    Since Mr. Conroe first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

340.    After first observing the spider-webbing, Mr. Conroe has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;

- The navigation feature did not work; and

- The backup camera did not work and was obscured by the spider-webbing.

341.    Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Conroe was unable to select the desired vents.

342.    In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.  For example:

- Mr. Conroe could not clearly see the CUE screen while driving because of the spiderwebbing, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen not been obscured by the Defect.

- While reversing his vehicle, Mr. Conroe was unable to see properly because the backup camera was obscured by the Defect.

- While attempting to make or answer a call, Mr. Conroe had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

- While attempting to use the navigational feature in the CUE, Mr. Conroe had to repeatedly press the CUE screen, which caused him to become distracted and to divert his eyes from the road for a longer period of time than had the CUE screen been functioning properly.

343.    Consequently, the Defect adversely affected Mr. Conroe's ability to concentrate and to drive safely.

344.    The State of West Virginia makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $100 for first-time offenders.

345.    Mr. Conroe has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

346.    Before purchasing his vehicle, Mr. Conroe saw advertising materials concerning his vehicle and its various features.  Additionally, before his purchase, Mr. Conroe spoke with authorized dealership personnel regarding his vehicle equipped with the new CUE system.  The dealership salesperson described the CUE system's features, how to operate the CUE, and assisted Mr. Conroe in setting up the CUE.  In addition, Mr. Conroe reviewed the vehicle's window sticker before purchase, which listed the vehicle's features, options, and price.  Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Conroe of the existence of the Defect

and/or the defective design prior to his purchase. Similarly, none of the advertising materials Mr. Conroe reviewed contained any information concerning the Defect.

## CLASS ACTION ALLEGATIONS

347.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

348.     Pursuant to Fed. R. Civ. Proc. 23(b)(2), (b)(3) or (c)(4), Plaintiffs assert classes based on the applicable state law of the plaintiffs. The Class and Sub-Classes are defined as:

**Nationwide Class**: All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**Alabama Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Alabama.

**Florida Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Florida.

**Indiana Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Indiana.

**Kansas Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Kansas.

**Maryland Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Maryland.

**Michigan Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Michigan.

**New Jersey Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of New Jersey.

**New Jersey TCCWNA Sub-Class**: All members of the New Jersey Sub-Class who are "consumers" as defined in the New Jersey Truth-in-Consumer, Contract, Warranty and Notice Act.

**New York Sub-Class**: All persons and entities who purchased or leased a Class

Vehicle in the State of New York.

**North Carolina Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of North Carolina.

**Texas Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Texas.

**Texas DTPA Sub-Class:** All members of the Texas Sub-Class who are "consumers" as defined in the Texas Deceptive Trade Practices Act ("DTPA").

**West Virginia Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of West Virginia.

349.    Excluded from the Class and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class or any Sub-Class should be expanded or otherwise modified.

350.    **Numerosity**: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

351.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class and Sub-Classes in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective CUE Systems. The representative Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective CUE System

components. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

352.    **Commonality**:    There are numerous questions of law and fact common to Plaintiffs, the Class and Sub-Classes that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

(a) Whether Class Vehicles contain defects relating to the CUE System;

(b) Whether the defects relating to the CUE System constitute an unreasonable safety risk;

(c) Whether the defective nature of the CUE System constitutes a material fact;

(d) Whether Defendant has a duty to disclose the defective nature of the CUE System to Plaintiffs and Class Members;

(e) Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

(f) Whether Defendant knew or reasonably should have known of the defects relating to the CUE System before it sold and leased Class Vehicles to Plaintiffs and Class Members and, if so, how long Defendant has known of the defect;

(g) Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective CUE System;

(h) Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective CUE System;

(i) Whether Defendant breached the implied warranty of merchantability pursuant to the laws governing each of the Sub-Class jurisdictions; and

(j) Whether Defendant breached express warranties pursuant to the laws governing each of the Sub-Class jurisdictions.

353.    **Adequate Representation**:  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

354.    **Predominance and Superiority**:  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

355.    In the alternative, this action is certifiable under the provisions of Fed. R. Civ. Proc. 23(b)(1) and/or (b)(2) because:

(a) The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for GM;

(b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c) GM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

356.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

## TOLLING OF THE STATUTES OF LIMITATIONS

357.    Because the Defect is undetectable until it manifests and GM failed to disclose or intentionally concealed the Defect, Plaintiffs and Class Members were not reasonably able to discover the problem until the Defect manifested after purchasing the Class Vehicles, despite exercise of due diligence.

358.    Additionally, on information and belief, GM instructed its authorized dealership employees and technicians to inform Class Members that the manifestations of the Defect in the CUE Systems were normal, and therefore not a defect as alleged herein.

359.    Plaintiffs and the Class Members had no realistic ability to discern that the GM CUE Systems in Class Vehicles were defective. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class Members.

360.    Plaintiffs are informed and believe and based thereon allege that GM has known of the Defect since before the purchases of the Class Vehicles and has concealed from or failed to alert owners and lessees of the Class Vehicles of the defective nature of the CUE Systems.

361.    Any applicable statute of limitations has therefore been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Defect.

**COUNT I**

**Breach of Warranty Under the Magnuson-Moss Warranty Act
15 U.S.C. § 2301 *et seq.*
(On Behalf of the Nationwide Class)**

362.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

363.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all Class Members.

364.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

365.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

366.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

367.    GM's express warranty is a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

368.    GM provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

369.    GM provided all purchasers and lessees of Class Vehicles with express and implied warranties.

370.    Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express

warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

371.    On information and belief, GM breached the express warranty by:

(a) Extending the Warranty with the purchase or lease of the Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship, including the subject CUE System, at no cost to the owner or lessee;

(b) Selling and leasing Class Vehicles with CUE Systems that were defective in material and workmanship, requiring repair or replacement within the warranty period;

(c) Refusing to honor the express warranty by repairing or replacing, free of charge, the CUE System or any of its component parts or programming and instead charging for repair and replacement parts; and

(d) Purporting to repair the Class Vehicles and/or performing inadequate, illusory repairs, including by falsely informing Class Members that there was no problem with their Class Vehicles, performing ineffective procedures including software updates, and/or replacing defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

372.    Furthermore, GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

373.    Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of

providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and/or manufacture of their CUE Systems.

374.    GM's breach of express and implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

375.    Plaintiffs and members of the Class have had sufficient direct dealings with either GM or its agents (dealerships and technical support) to establish privity of contract between GM, on one hand, and Plaintiffs and each of the other Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

376.    The amount in controversy of the individual claims of each Plaintiff and Class member meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

377.    GM has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the CUE System.

378.    As a direct and proximate cause of GM's breach of express and implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. GM's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

379.    As a result of GM's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

92

**COUNT II**

**Violation of Alabama's Deceptive Trade Practices Act ("Alabama DTPA")**
**(Ala. Code §§ 8-19-1, *et seq.*)**
**(On Behalf of the Alabama Sub-Class)**

380.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

381.    Plaintiffs Robinson and Schellhammer and the Alabama Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

382.    Plaintiffs, the Alabama Class, and General Motors are "persons" within the meaning of Ala. Code § 8-19-3(5).

383.    The Class Vehicles and/or the Defective CUEs in them are "goods" within the meaning of Ala. Code. § 8-19-3(3).

384.    Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

385.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

386.    By failing to disclose and by actively concealing the defective nature of the CUE installed in the Class Vehicles, Defendant engaged in deceptive business practices prohibited by the Alabama DTPA, including: representing that the Class Vehicles and/or the CUEs installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the

intent not to sell or lease them as advertised and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

387.    Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the CUEs installed in them.

388.    General Motors knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the CUEs, and that the CUEs were not suitable for their intended use.

389.    By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Alabama DTPA. Defendant deliberately withheld the information about the propensity of the CUEs to delaminate and/or fail, in order to ensure that consumers would purchase the Class Vehicles.

390.    In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

391.    Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

392.    Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the CUE installed in them with an intent to mislead Plaintiffs and the Alabama Class.

393.    Defendant knew or should have known that their conduct violated the Alabama DTPA.

394.    As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the CUEs installed in them that were either false or misleading.

395.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving unsafe vehicles.

396.    Defendant owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the CUEs installed in them because Defendant:

   (a) Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   (b) Intentionally concealed the foregoing from Plaintiffs; and/or

   (c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

397.    Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the CUE installed in them, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

398.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the CUE in Class Vehicles were material to Plaintiffs and the Alabama Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

399.     Plaintiffs and the Alabama Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the CUE Defect that existed in the Class Vehicles and/or the CUE installed in them, and Defendant's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

400.     Defendant's violations present a continuing risk to Plaintiffs, the Alabama Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

401.     As a direct and proximate result of Defendant's violations of the Alabama DTPA, Plaintiffs and the Alabama Class have suffered injury-in-fact and/or actual damage.

402.     Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Class member.

403.     Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1, et seq.

404.     In accordance with Ala. Code § 8-19-10(e), Plaintiffs' counsel, on behalf of Plaintiffs, served Defendant with notice of their alleged violations of the Alabama DTPA relating to the Class Vehicles and/or the CUE installed in them purchased by Plaintiffs and the Alabama Class, and demanded that Defendant correct or agree to correct the actions described therein. If Defendant fails to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

**COUNT III**

**Violation of Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213**
**(On Behalf of the Florida Sub-Class)**

405.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

406.    Plaintiffs Lana Savage, William Braden, Joseph Palopoli, Jr., and Earl Kladke, (collectively, the "Florida Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

407.    GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

408.    At all relevant times, the Florida Plaintiffs and the Florida Sub-Class Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

409.    GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

410.    The practices of GM, described above, violate the FDUTPA for, *inter alia*, one or more of the following reasons:

(a) GM represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

(b) GM provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the CUE Systems;

(c) GM represented that goods or services were of a particular standard, quality, or grade, when they were of another;

(d) GM engaged in unconscionable commercial practices in failing to reveal material facts and information about the CUE Systems, which did, or tended to, mislead the Florida Plaintiffs and the Florida Sub-Class Members about facts that could not reasonably be known by the consumer;

(e) GM failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

(f) GM caused the Florida Plaintiffs and the Florida Sub-Class Members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

(g) GM failed to reveal material facts to the Florida Plaintiffs and the Florida Class with the intent that the Florida Plaintiffs and the Florida Sub-Class Members rely upon the omission;

(h) GM made material representations and statements of fact to the Florida Plaintiffs and the Florida Sub-Class Members that resulted in the Florida Plaintiffs and the Florida Sub-Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

(i) GM intended that the Florida Plaintiffs and the Florida Sub-Class Members rely on their misrepresentations and omissions, so that the Florida Plaintiffs and the Florida Sub-Class Members would purchase vehicles equipped with the CUE Systems.

411.    GM's actions impact the public interest because the Florida Plaintiffs and the Florida Sub-Class Members were injured in exactly the same way as thousands of others purchasing and/or leasing the vehicles with defective CUE Systems as a result of and pursuant to GM's generalized course of deception.

412.    Had the Florida Plaintiffs and the Florida Sub-Class Members known of the defective nature of the CUE Systems, they would not have purchased or leased vehicles equipped with the CUE Systems or would have paid less for them.

413.    The foregoing acts, omissions and practices proximately caused the Florida Plaintiffs and the Florida Sub-Class Members to suffer actual damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution in value of the vehicles equipped with CUE Systems, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

## COUNT IV

### Breach of Express Warranty (Florida)
### F.S.A. §§ 672.31, 680.21
### (On Behalf of the Florida Sub-Class)

414.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

415.    The Florida Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

416.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

417.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

418.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

419.    GM provided all purchasers and lessees of the Class Vehicles with the express Warranty described herein, which became a material part of the bargain.

420.    Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of

the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

421.    GM manufactured and/or installed the CUE Systems and the CUE Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

422.    The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to the Florida Plaintiffs and the Florida Sub-Class Members.

423.    Plaintiffs relied on GM's express Warranty, which was a material part of the bargain, when purchasing or leasing their Class Vehicles.

424.    Under the express Warranty, GM was obligated to correct the Defect in the vehicles owned or leased by the Florida Plaintiffs and the Florida Sub-Class Members.

425.    Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the Defect.

426.    GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed Florida Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

427.    GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

428.    Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

429.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect the Florida Plaintiffs and the Florida Sub-Class Members. Among other things, the Florida Plaintiffs and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

430.    Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

431.    The Florida Plaintiffs and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal and external sources.

432.    Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

433.    Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

434.    As a direct and proximate cause of GM's breach, the Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally,

the Florida Plaintiffs and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

435. As a direct and proximate result of GM's breach of express Warranty, the Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT V

### Breach of the Implied Warranty of Merchantability (Florida)
### F.S.A. §§ 672.314, 680.212
### (On Behalf of the Florida Sub-Class)

436. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

437. The Florida Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

438. GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

439. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

440. The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

441. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

442. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom the Florida Plaintiffs and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers

102

purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to the Florida Plaintiffs and the Florida Sub-Class Members, with no modification to the defective CUE Systems.

443. GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

444. This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

445. Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their CUE Systems and the existence of the Defect at the time of sale or lease and thereafter. GM knew of this Defect at the time these sale or lease transactions occurred.

446. As a result of GM's breach of the applicable implied warranties, the Florida Plaintiffs and the Florida Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, the Florida Plaintiffs and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

447. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of F.S.A. §§ 672.314 and 680.212.

448.    The Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

449.    The Florida Plaintiffs and the Florida Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

450.    As a direct and proximate cause of GM's breach, the Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, the Florida Plaintiffs and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

451.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, the Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

## COUNT VI

### Violation of the Indiana Deceptive Consumer Sales Act
### (Ind. Code §§ 24-5-0.5-3)
### (On Behalf of the Indiana Sub-Class)

452.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

453.    Plaintiff Bradley brings this claim on behalf of the Indiana Class.

454.    Defendant is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

455.    Plaintiff's and the Indiana Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

456.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

457.    In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the CUEs installed in them.

458.    By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the Defective CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Indiana UTPA. Defendant deliberately withheld the information about the propensity of the CUEs to fail, in order to ensure that consumers would purchase the Class Vehicles.

105

459.    In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

460.    Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

461.    Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective CUEs installed in them with an intent to mislead Plaintiff and the Indiana Class.

462.    Defendant knew or should have known that its conduct violated the Indiana DCSA.

463.    As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them that were either false or misleading.

464.    To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

465.    Defendant owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective CUE installed in them because Defendant:

        (a)  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        (b)  intentionally concealed the foregoing from Plaintiff; and/or

(c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

466.    Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the Defective CUE installed in them the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

467.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective CUEs in Class Vehicles were material to Plaintiff and the Indiana Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

468.    Plaintiff and the Indiana Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles and/or the Defective CUEs installed in them, and Defendant's complete disregard for safety, Plaintiff either would have paid less for the vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of her bargain as a result of Defendant's misconduct.

469.    Defendant's violations present a continuing risk to Plaintiff, the Indiana Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

470.    As a direct and proximate result of Defendant's violations of the Indiana DCSA, Plaintiff and the Indiana Class have suffered injury-in-fact and/or actual damage.

471.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff and the Indiana Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each

Indiana Class member, including treble damages up to $1,000 for Defendant's willfully deceptive acts.

472.     In accordance with Ind. Code § 24-5-0.5-5(a)(1), The Defect is incurable and as such Plaintiff is not required to provide written notice to Defendant of the alleged violations of the Indiana DCSA relating to the Class Vehicles and/or the Defective CUEs installed in them purchased by Plaintiff and the Indiana Class. Plaintiff seeks full relief for Defendant's actions including compensatory and monetary damages to which Plaintiff and Class Members are entitled.

473.     Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the Indiana Class to cruel and unjust hardship as a result. Defendant's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them, deceived Plaintiff and the Indiana Class and concealed material facts that only Defendant knew, all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles and/or the Defective CUE installed in them. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiff further seeks an order enjoining Defendant's unfair or deceptive acts or practices.

### COUNT VII

### Breach of the Implied Warranty of Merchantability (Indiana)
### (Ind. Code §§ 26 *et seq.*)
### (On Behalf of the Indiana Sub-Class)

474.     Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

475.     Plaintiff Bradley brings this claim on his behalf and on behalf of the Indiana Class.

476.     General Motors is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Ind. Code § 26-1-2-104(1).

477.    A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Ind. Code § 26-1-2-314.

478.    The Class Vehicles and/or the defective CUEs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and infotainment systems are used.

479.    Defendant was provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers.

480.    As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the Indiana Class have been damaged in an amount to be proven at trial.

## COUNT VIII

### Violations of the Kansas Consumer Protection Act
### (Kan. Stat. Ann. § 50-623, *et seq.*)
### (On Behalf of the Kansas Sub-Class)

481.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

482.    Plaintiff John Toda brings this action on behalf of himself and the Kansas Sub-Class against Defendant.

483.    General Motors is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

484.    Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

485.    The sale of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

486.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

487.    In the course of their business, Defendant concealed and suppressed material facts concerning the Class Vehicles. Defendant accomplished this by installing a defective CUE. Plaintiff and Kansas Class members did not and could not unravel Defendant's deception on their own.

488.    Defendant thus violated the Act by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

489.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

490.    Defendant engaged in misleading, false, unfair or deceptive acts or practices that violated the Kansas CPA by installing, failing to disclose and actively concealing the defective

CUEs and by marketing its vehicles as reliable, safe, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and that stood behind its vehicles after they were sold.

491.     Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Kansas Class.

492.     Defendant knew or should have known that its conduct violated the Kansas CPA.

493.     Defendant owed Plaintiff a duty to disclose the Defect and the safety risks of the Class Vehicles because they:

> (a) possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that had defective CUEs;
>
> (b) made incomplete representations about the safety and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

494.     The value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be worth.

495.     Defendant's unfair or deceptive acts or practices were likely to and did in fact reasonable consumers, including Plaintiff, about the safety and reliability of Cadillac-branded vehicles, the quality of the Cadillac brand, and the true value of the Class Vehicles.

496.     Plaintiff and the Kansas Class suffered an ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and Kansas Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or if the Vehicles' true nature had been disclosed and mitigated, would have paid significantly less for them. Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

497.     Defendant had an ongoing duty to all Cadillac customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered ascertainable

loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

498.    As a direct and proximate result of Defendant's violations of the Kansas CPA, Plaintiff and the Kansas Class have suffered injury-in-fact and/or actual damage.

499.    Pursuant to Kan. Stat. Ann. § 50-634, Plaintiff and the Kansas Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and each Kansas Class member.

500.    Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

## COUNT IX

### Breach of Implied Warranty of Merchantability (Kansas)
### (Kan. Stat. §§ 84-2-314 and 84-2A-212)
### (On Behalf of the Kansas Sub-Class)

501.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

502.    Plaintiff John Toda brings this Count on behalf of himself and the Kansas Sub-Class against Defendant.

503.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

504.    With respect to leases, Defendant is and was at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

505.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

506.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

507.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are defective in that they contain the defective CUE, rendering the infotainment system and certain safety features inoperable.

508.    Defendant was provided notice of these issues by the Complaint and instant First Amended Complaint, and by numerous individual letters and communications sent by consumers within a reasonable amount of time after the allegations of Defect became public.

509.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and the other Kansas Class members have been damaged in an amount to be proven at trial

## COUNT X

### Violation of Maryland Consumer Protection Act ("MCPA")
### (Md. Code Ann. Commercial Law § 13-101, et seq.)
### (On Behalf of the Maryland Sub-Class)

510.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

511.    Plaintiff Maxine Glenn brings this cause of action on her behalf and on behalf of the Maryland Sub-Class.

512.    Plaintiff Maxine Glenn and the Maryland Sub-Class members are consumer within the meaning of the MCPA and Md. Code Ann. Commercial Law § 13-101.

513.    The Vehicles are consumer goods within the meaning of the MCPA and provided services within the MCPA's meaning of the term consumer services.

514.    The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

515.    General Motors violated the MCPA by, inter alia, engaging in the following unfair deceptive acts or practices:

(a) Failing to disclose material facts that deceived and had the tendency to deceive; and

(b) Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease.

516.    General Motors violated the MCPA by concealing, suppressing or omitting material facts regarding the Vehicles, including, but not limited to, the fact that the Vehicles' CUE is defective, that as a result of such defect, the Vehicles' CUE fails prematurely, and that the cost of replacing or repairing the CUE is prohibitively high. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase, or how much to pay for, the Vehicles.

517.    General Motors concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Glenn and the Maryland Class would rely on the omissions in the purchase or lease of their Vehicles.

518.    To this day, General Motors continues to violate the MCPA by actively concealing the material information about the Vehicles and their CUEs by representing to Plaintiff Glenn and members of the Maryland Class that the Vehicles are defect-free and safe.

519.    General Motors intended that Plaintiff Glenn and the Maryland Class members would rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

520.    As a direct and proximate cause of General Motors' violations of the MCPA, Plaintiff Glenn and the Maryland Class have suffered injury in fact and/or actual damage, in that they purchased or leased Vehicles with defective CUEs that are unreasonably expensive to repair

and/or replace. Had General Motors disclosed the true quality, nature and drawbacks of the Vehicles, Plaintiff Glenn and the Maryland Class members would not have purchased, or would have paid significantly less, for the Vehicles. Plaintiff Glenn and the Maryland Class have suffered further harm in that the Vehicles' CUEs fail prematurely, they have paid or will be required to pay significantly more to repair or replace the CUE than is reasonably anticipated and represented, and the Vehicles have suffered diminution in value.

521.    Plaintiff Glenn and the Maryland Class are entitled to recover damages, reasonable attorneys' fees and costs, and expert expenses as a result of General Motors' violations of the MCPA.

## COUNT XI

### Breach of Implied Warranty of Merchantability (Maryland)
### (Md. Code Com. Law §§ 2-314 and 2A-212)
### (On Behalf of the Maryland Sub-Class)

522.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

523.    Plaintiff Maxine Glenn brings this cause of action on her behalf and on behalf of the Maryland Sub-Class.

524.    General Motors is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

525.    With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

526.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

527.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

528.    These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

529.    Because of the Defect in the CUE, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

530.    General Motors was provided notice of these issues by the numerous complaints filed against it including the Complaint and the instant First Amended Complaint, and by numerous individual inquires and communications sent by Plaintiff and other Maryland Class Members and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

531.    As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiff and the other Maryland Class members have been damaged in an amount to be proven at trial.

### COUNT XII

**Violation of Michigan Consumer Protection Act**
**MICH. COMP. LAWS § 445.903 *et seq.***
**(On Behalf of the Michigan Sub-Class)**

532.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

533.    Plaintiffs Gladys Tubbs, and Nicole Blanchard (collectively, the "Michigan Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Michigan Sub-Class.

534.    The Michigan Plaintiffs and the Michigan Sub-Class Members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

535.    GM is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS Laws § 445.902(1)(d).

536.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce,"

including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1).

537.    GM participated in misleading, false, or deceptive acts that violated the Michigan CPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

538.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

539.    GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

540.    GM knew that the Class Vehicles and their CUE Systems suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

541.    GM knew or should have known that its conduct violated the Michigan CPA.

542.    The Michigan Plaintiffs and the Michigan Sub-Class Members reasonably relied on GM's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

543.    Had the Michigan Plaintiffs and the Michigan Sub-Class Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

544.    GM owed the Michigan Plaintiffs and the Michigan Sub-Class Members a duty to disclose the truth about the Defect because GM: (a) possessed exclusive knowledge of the design of the Class Vehicles and the Defect; (b) intentionally concealed the foregoing from the Michigan Plaintiffs and the Michigan Sub-Class Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from the Michigan Plaintiffs and the Michigan Sub-Class Members that contradicted these representations.

545.    Due to GM's specific and superior knowledge that the CUE Systems in the Class Vehicles will fail due to the Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by the Michigan Plaintiffs and the Michigan Sub-Class Members on these material representations, GM had a duty to disclose to Class members that the CUE Systems will fail in Class Vehicles, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to the Michigan Plaintiffs and the Michigan Sub-Class Members, GM had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by the Michigan Plaintiffs and the Michigan Sub-Class Members. Longevity, durability, performance, and safety are material concerns to consumers. GM represented to the Michigan Plaintiffs and the Michigan Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing CUE Systems of advanced and superior characteristics and technology as alleged

throughout this Complaint, when in fact it is only a matter of time before the CUE Systems fail due to the Defect.

546.     The Michigan Plaintiffs and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of GM's conduct, the Michigan Plaintiffs and the Michigan Sub-Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

547.     As a result of GM's conduct, the Michigan Plaintiffs and the Michigan Sub-Class Members were harmed and suffered actual damages as a result of GM's misrepresentations and omissions with regard to their Class Vehicles' CUE Systems because they purchased vehicles which do not perform as advertised.

548.     As a direct and proximate result of GM's unfair or deceptive acts or practices, the Michigan Plaintiffs and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

549.     Defendant's violations present a continuing risk to the Michigan Plaintiffs and the Michigan Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

550.     The Michigan Plaintiffs and the Michigan Sub-Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 per each Plaintiff; and reasonable attorneys' fees; and any other just and proper relief available.

## COUNT XIII

### Breach of Express Warranty
### MICH. COMP. LAWS §§ 440.2313 and 440.2860
### (On Behalf of the Michigan Sub-Class)

551.     Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

552.    The Michigan Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Michigan Sub-Class.

553.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

554.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

555.    The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

556.    GM provided all purchasers and lessees of the Class Vehicles with the express Warranty described herein, which became a material part of the bargain.

557.    Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

558.    GM manufactured and/or installed the CUE Systems and the CUE Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

559.    The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Michigan Plaintiff and the Michigan Sub-Class Members.

560.    Plaintiffs relied on GM's express Warranty, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

561.    Under the express Warranty, GM was obligated to correct the Defect in the vehicles owned or leased by the Michigan Plaintiffs and the Michigan Sub-Class Members.

120

562.    Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the Defect.

563.    GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed Michigan Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

564.    GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

565.    Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

566.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect the Michigan Plaintiffs and the Michigan Sub-Class Members. Among other things, the Michigan Plaintiffs and the Michigan Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

567.    The Michigan Plaintiffs and the Michigan Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

568.    The Michigan Plaintiffs and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or

replacements of the CUE Systems or components thereof, and through other internal and external sources.

569.    Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

570.    Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

571.    As a direct and proximate cause of GM's breach, the Michigan Plaintiffs and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, the Michigan Plaintiffs and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

572.    As a direct and proximate result of GM's breach of express Warranty, the Michigan Plaintiffs and the Michigan Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT XIV

### Breach of the Implied Warranty of Merchantability
MICH. COMP. LAWS §§ 440.2314 and 440.2862
(On Behalf of the Michigan Sub-Class)

573.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

574.    The Michigan Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Michigan Sub-Class.

575.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

576.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

577.    The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

578.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under MICH. COMP. LAWS §§ 440.2314 and 440.2862.

579.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom the Michigan Plaintiffs and the Michigan Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to the Michigan Plaintiffs and the Michigan Sub-Class Members, with no modification to the defective CUE Systems.

580.    GM provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

581.    This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

582.    Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture

123

of their CUE Systems and the existence of the Defect at the time of sale or lease and thereafter. GM knew of this Defect at the time these sale or lease transactions occurred.

583.    As a result of GM's breach of the applicable implied warranties, the Michigan Plaintiffs and the Michigan Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Michigan Plaintiffs and the Michigan Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

584.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of MICH. COMP. LAWS §§ 440.2314 and 440.2862.

585.    The Michigan Plaintiffs and the Michigan Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

586.    The Michigan Plaintiffs and the Michigan Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

587.    As a direct and proximate cause of GM's breach, the Michigan Plaintiffs and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, the Michigan Plaintiffs and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

588.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, the Michigan Plaintiffs and the Michigan Sub-Class Members have been damaged in an amount to be proven at trial.

**COUNT XV**

**Violations of New Jersey Consumer Fraud Act**
**(N.J.S.A. 56:8-1, *et seq.*)**
**(On Behalf of the New Jersey Sub-Class)**

589.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

590.    Plaintiffs Tonya Gruchacz and Robert Tyson (collectively, the "New Jersey Plaintiffs") bring this count on their behalf and on behalf of the members of the New Jersey Sub-Class.

591.    Numerous controlling state and federal cases recite and explain the broadly remedial aims of the New Jersey Consumer Fraud Act (hereinafter "NJFCA").

592.    The Class Vehicles are "merchandise" within the meaning of the NJCFA.

593.    The New Jersey Plaintiffs and Sub-Class Members are "consumers" within the protective ambit of the NJCFA.

594.    Protecting the New Jersey Plaintiffs and Subclass Members from and against "any unconscionable commercial practice, deception, fraud, false pretense, or misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise,"[24] the NJCFA applies to GM's sales of the Class Vehicles to the New Jersey Plaintiffs and Subclass Members.

595.    Defendant, upon information and belief, made the above-described misrepresentations, concealment and omissions of material facts to the New Jersey Plaintiffs and all Subclass Members. GM did not disclose to its customers the fact that the Defect existed at the time of sale and that the Defect would cause the screens of the CUE System to suddenly appear bubbled, cracked or delaminated, making it extremely difficult or near impossible to see the contents of the CUE radio/navigation system and making the touch screen become

---

[24] N.J.S.A. 56:8-2.

unresponsive to touch. Nor did GM disclose that warranty or the recommended post-warranty repairs would not cure or rectify the Defect and would only, at best, briefly delay the impact of the Defect. Instead, in its uniform marketing and advertising, GM falsely represented that its Cadillac CUE radio/navigation system provides the "innovative brilliance of your tablet to your entire driving experience…right at your fingertips."." *See* n.18.

596.    GM's distribution, promotion, marketing, sale, and leasing to Subclass members of the Class Vehicles with CUE Systems, without disclosing that the CUE Systems will suddenly appear bubbled, cracked or delaminated making it extremely difficult or near impossible to see the contents of the CUE radio/navigation system  and making the touch screen become unresponsive to touch, was an unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or otherwise constituted the knowing, concealment, suppression or omission of material fact with the intent that the New Jersey Plaintiffs and Subclass Members would rely upon GM's knowing, concealment, suppression or omission of information that the CUE Systems had the Defect.

597.    As a result thereof, the members of the New Jersey subclass suffered as an ascertainable loss in that they received a vehicle with the Defect, worth less than a vehicle without the Defect, resulting further in diminution of value and, in addition, an ascertainable loss based on compensatory damages required in order to install a non-defective CUE system.

## COUNT XVI

**Violation of New Jersey Truth-in-Consumer,
Contract, Warranty and Notice Act ("TCCWNA")
(N.J.S.A. 56:12-14, *et seq.*)
(On Behalf of the New Jersey TCCWNA Sub-Class)**

598.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

599.    Plaintiffs Tonya Gruchacz and Robert Tyson (collectively, the "New Jersey Plaintiffs") bring this count on their behalf and on behalf of the members of the New Jersey TCCWNA Sub-Class.

600.    The New Jersey Plaintiffs and those similarly situated are "consumers" within the meaning of TCCWNA, as set forth at N.J.S.A. 56:12-15.

601.    Defendant is a seller within the meaning of TCCWNA, as set forth at N.J.S.A. 56:12-15 and -17.

602.    TCCWNA, at N.J.S.A. 56:12-15, provides in relevant part that "no seller, creditor, lender or bailee may offer or enter into any written consumer contract or give or display any notice which includes any provision that violates a clearly established right of the consumer or responsibility of the seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."

603.    By violating the NJCFA, and a clearly established legal right of a consumer and/or responsibility of the seller to not engage in any misrepresentations, deception, or unconscionable commercial conduct in connection with consumer sales as detailed in this Complaint, Defendant thereby violated the Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 *et seq.*

604.    As the result of Defendant's violations of TCCWNA, Plaintiff and the New Jersey TCCWNA Sub-Class Members are entitled to statutory damages of not less than $100 each as provided by N.J.S.A. 56:12-17.

## COUNT XVII

**Breach of Implied Warranty (New Jersey)**
**(N.J. Stat. § 12A:2-314)**
**(On Behalf of the New Jersey Sub-Class)**

605.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

127

606.    The New Jersey Plaintiffs bring this count on their behalf and on behalf of the members of the New Jersey Sub-Class.

607.    The Class Vehicles are "goods" under the Uniform Commercial Code ("UCC").

608.    GM is a "merchant" under the UCC.

609.    GM made implied warranties to the New Jersey Plaintiffs and Class and Subclass Members about the merchantable quality of the CUE System.

610.    GM impliedly warranted, among other things, that the CUE Systems were of good and merchantable quality and would actually be able to display information to drivers of the Class Vehicles.

611.    Through the conduct alleged herein, GM has breached the implied warranty of fitness for a particular purpose.  The defectively designed CUE Systems were not fit for the particular purpose for which they were purchased by Plaintiff and Class and Subclass Members. The New Jersey Plaintiffs and New Jersey Sub-Class Members purchased the Class Vehicles with CUE Systems, at an additional price for those Systems, for a particular purpose of having access to viewable information/content pertaining to, among other things, navigation, radio and surrounding areas of the vehicle transmitted by the numerous cameras placed on the outside of the car.  GM knew that the New Jersey Plaintiffs and Sub-Class Members were purchasing the Class Vehicles with CUE Systems for this purpose and marketed the CUE Systems for this particular purpose, even advertising that it provides the innovative brilliance of your tablet to your entire driving experience…right at your fingertips.”."

612.    The New Jersey Plaintiffs and New Jersey Sub-Class Members relied on Defendant's misrepresentations by purchasing the Class Vehicles with CUE Systems.

613.    Defendant knew or had reason to know that the New Jersey Plaintiffs and New Jersey Sub-Class Members were influenced to purchase the Class Vehicles with CUE Systems through Defendant's expertise, skill, judgment and knowledge in furnishing the products for their intended use.

614.    The CUE Systems were not of merchantable quality and were not fit for their particular intended use because the design and/or manufacturing defects alleged herein render them incapable of being able to transmit information to the driver and passengers such as viewable information/content pertaining to navigation, radio and surrounding areas of the vehicle transmitted by the numerous cameras placed on the outside of the car.

615.    Defendant's actions, as complained of herein, breached its implied warranty that the CUE Systems were of merchantable quality as fit for such use, in violation of the Uniform Commercial Code (UCC § 2-314 and § 2-3154) and the common law of this State, as well as the common law and statutory laws of the other states.

616.    The New Jersey Plaintiffs and New Jersey Sub-Class Members have incurred damage as described herein as a direct and proximate result of the failure of Defendant to honor its implied warranty.  In particular, the New Jersey Plaintiffs and New Jersey Sub-Class Members would not have purchased the Class Vehicles with CUE Systems had they known the truth about their defects, or they would have paid less for the CUE Systems; nor would they have suffered the damages associated with these defects.

## COUNT XVIII

### Breach of Express Warranty (New Jersey)
### (On Behalf of the New Jersey Sub-Class)

617.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

618.    The New Jersey Plaintiffs bring this count on their behalf and on behalf of the members of the New Jersey Sub-Class.

619.    GM expressly warranted to the New Jersey Plaintiffs and the members of the New Jersey Sub-Class that the CUE System can provide drivers information in "real time."  In fact, GM represented in marketing material and on its website that CUE radio/navigation system provides the "innovative brilliance of your tablet to your entire driving experience…right at your

fingertips.",'" and that the vehicle was covered by a written warranty that would cover the costs necessary to repair any defects.

620.    GM also expressly warranted the New Jersey Plaintiffs' Cadillacs, including the CUE System against defects. Indeed, the Warranty provided with Plaintiff's vehicle states the following:

> **Bumper-to-Bumper (Includes Tires)**.  Coverage is for the first 4 years or 50,000 miles, whichever comes first.
>
> **What is Covered**
>
> …
>
> **Repairs Covered**.  The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle related to materials or workmanship occurring during the warranty period.  Needed repairs will be performed using new, remanufactured, or refurbished parts.
>
> **No Charge**.  Warranty repairs including towing, parts, and labor, will be made at no charge.

621.    GM received notification about and was on notice of the Defect well before the New Jersey Plaintiffs began this litigation, and well before the New Jersey Plaintiffs purchased their Cadillacs.

622.    Defendant has breached its express warranties, as set forth above, by supplying the Class Vehicles' CUE Systems in a condition which does not meet the Warranty obligations undertaken by GM and by failing to repair or replace the defective CUE Systems or defective parts.

623.    Defendant has received notice from Plaintiff that the Defect in her vehicle manifested within the warranty period only weeks after the unconscionably short warranty period expired. Despite this notice and GM's knowledge, GM refused to honor its warranty, even though it knew of the Defect in the CUE System.

624.    Moreover, Defendant's advertising that the CUE radio/navigation system provides the "innovative brilliance of your tablet to your entire driving experience…right at your

fingertips.".," and was warrantied to cover all costs associated with the Defect, created an express warranty, which Defendant breached by supplying Plaintiff and the Class and Subclass Members with CUE Systems that contained a defect that caused the CUE System touch screen to become unresponsive and then to suddenly appear bubbled, cracked or delaminated making it extremely difficult or near impossible to see the contents of the CUE radio/navigation system.

625.    Indeed, the Defect manifested within the warranty period when it became unresponsive to touch prior to the expiration of the 4-year, 50,000 mile warranty.  GM's express warranty warranted, for 4 years or 50,000 miles, its affirmation and description of the CUE System's performance. When the CUE System became unresponsive to touch within the warranty period, GM breached its written Warranty and the warranties that the CUE System would provide the "innovative brilliance of your tablet to your entire driving experience…right at your fingertips.".," and that the vehicle came with a warranty that covered all costs necessary to repair the Defect.

626.    As a result of these breaches, members of the New Jersey Sub-Class sought repairs to their CUE Systems, but GM denied them warranty coverage.

627.    Defendant has been afforded notice and a reasonable opportunity to cure its breach of warranties and/or the New Jersey Plaintiffs and the members of the New Jersey Sub-Class were not required to do so because providing Defendant a reasonable opportunity to cure its breach of written warranties would have been futile. Defendant has been on notice of the Defect from the complaints and service requests it received from Plaintiff and Class members, as well as from its own warranty claims, customer complaint data, and/or parts sales data.

628.    Defendant has failed to provide the New Jersey Plaintiffs and the members of the New Jersey Sub-Class a warranty replacement in the form of a product that conforms to the qualities and characteristics that GM expressly warranted when it sold/leased the Class Vehicles with CUE Systems to Plaintiff and the Class.

629.    The time limits in GM's express warranty are commercially unconscionable.  GM knew that the New Jersey Plaintiffs and the members of the New Jersey Sub-Class would likely

not discover the fact of or the reason their CUE System screens became bubbled, cracked or delaminated until after the 4-year, 50,000-mile warranty period had expired.

630.    The New Jersey Plaintiffs and the members of the New Jersey Sub-Class had no meaningful opportunity to bargain over, let alone expand, the Class Vehicles' warranty terms. These warranties are classic adhesion contracts, produced by the manifest and massive differences between GM's and the individual bargaining power of the New Jersey Plaintiffs and the members of the New Jersey Sub-Class, whose terms were uniform and uniformly of the "take it or leave it" variety.

631.    The New Jersey Plaintiffs and the members of the New Jersey Sub-Class have complied with all of their obligations under their Class Vehicles' warranties. To the extent they have not, such compliance is excused by GM's misconduct.

632.    GM's breach of its express warranties caused damages to the New Jersey Plaintiffs and the members of the New Jersey Sub-Class.

## COUNT XIX

### Violations of New York General Business Law § 349
### (N.Y. Gen. Bus. Law § 349)
### (On Behalf of the New York Sub-Class)

633.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

634.    Plaintiff Katrina Howard brings this claim on her own behalf and on behalf of the members of the New York Sub-Class.

635.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

636.    In the course of General Motors' business, it willfully failed to disclose and actively concealed the dangerous risk of CUE failure in Class Vehicles as described above. Accordingly, General Motors engaged in unfair methods of competition, unconscionable acts or practices, and

unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive a reasonable consumer acting reasonably.

637.    General Motors' actions as set forth above occurred in the conduct of trade or commerce.

638.    Because General Motors' deception takes place in the context of automobile safety, its deception affects the public interest. Further, General Motors' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

639.    General Motors' conduct proximately caused injuries to Plaintiff and the other New York Class members.

640.    Plaintiff Howard and the members of the New York Sub-Class were injured as a result of General Motors' conduct in that Plaintiff Howard and the members of the New York Sub-Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of General Motors' misrepresentations and omissions.

641.    Plaintiff Howard and members of the New York Sub-Class are entitled to compensatory damages in the form of actual damages or statutory damages, whichever is greater, which may be trebled as a result of Defendant's willful and/or knowing conduct as alleged herein and attorneys' fees and expenses.

## COUNT XX

### Violations of New York General Business Law § 350
### (N.Y. Gen. Bus. Law § 350)
### (On Behalf of the New York Sub-Class)

642.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

643.    Plaintiff Howard brings this count on her own behalf and on behalf of the members of the New York Sub-Class.

644.    New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of …representations [made] with respect to the commodity…." N.Y. Gen. Bus. Law § 350-a.

645.    General Motors caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to General Motors, to be untrue and misleading to consumers, including Plaintiff and the other New York Class members.

646.    General Motors has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the dangerous risk of CUE failure in Class Vehicles as described above, as well as the inherently defective nature of the CUE as designed and sold by General Motors, and the loss of communications and entertainment functionality as described above, were material and likely to deceive a reasonable consumer.

647.    Plaintiff Howard and the members of the New York Sub-Class have suffered injury, including the loss of money or property, as a result of General Motors false advertising. In purchasing or leasing their Class Vehicles, Plaintiff Howard and the members of the New York Sub-Class relied on the representations and/or omissions of General Motors with respect to the safety, quality, functionality, and reliability of the Class Vehicles. General Motors' representations turned out to be untrue because the CUEs installed in Class Vehicles are prone to total system failures, diminished or completely inoperable functionality, and other failures as described hereinabove. Had Plaintiff Howard and the members of the New York Sub-Class known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

648.    Accordingly, Plaintiff Howard and the members of the New York Sub-Class overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

649.    Plaintiff Howard, individually and on behalf of the members of the New York Sub-Class, requests that this Court enter such orders or judgments as may be necessary to enjoin General Motors from continuing its unfair, unlawful and/or deceptive practices. Plaintiff Howard and each member of the New York Sub-Class are also entitled to recover their actual damages or $50 per violation, whichever is greater. Because General Motors acted willfully or knowingly, Plaintiff Howard and the members of the New York Sub-Class are entitled to recover three times actual damages, up to $10,000.

## COUNT XXI

### Breach of Implied Warranty (New York)
### (N.Y. U.C.C. Law § 2-315)
### (On Behalf of the New York Sub-Class)

650.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

651.    Plaintiff Howard brings this count on her own behalf and on behalf of the members of the New York Sub-Class.

652.    General Motors marketed the Vehicles as safe and reliable luxury vehicles. Such representations formed a basis of the bargain in the decisions of Plaintiff Howard and the members of the New York Sub-Class to purchase the Vehicles.

653.    General Motors was at all relevant times a "merchant" of motor vehicles as defined by N.Y. U.C.C. Law § 2-104.

654.    A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions

655.    General Motors' implied warranty formed a basis of the bargain that was reached when Plaintiff and the other New York Class members purchased their Vehicles.

656.    Plaintiff Howard and the members of the New York Sub-Class owned Vehicles with defective CUEs within the warranty period but had no knowledge of the existence of the Defect, which was known and concealed by General Motors.

657.    Despite the existence of the warranty, General Motors failed to inform Plaintiff Howard and the members of the New York Sub-Class that the Vehicles contained the defective infotainment systems during the warranty periods.

658.    General Motors breached the implied warranty promising to repair and correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

659.    General Motors knew about the Defect in the infotainment system, allowing General Motors to cure their breach of its warranty if it chose.

660.    However, General Motors concealed the Defect and has refused to repair or replace the CUEs despite the Defect's existence at the time of sale or lease of the Vehicles.

661.    Any attempt by General Motors to disclaim or limit recovery to the terms of the implied warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff Howard and the members of the New York Sub-Class. Among other things, Plaintiff Howard and the members of the New York Sub-Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and Plaintiff Howard and the members of the New York Sub-Class, and General Motors knew that the CUEs were defective at the time of sale.

662.    Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Howard and the members of the New York Sub-Class whole because the replacement part used by General Motors contains the same Defect. Affording General Motors, a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

663.    Accordingly, General Motors is liable to Plaintiff Howard and the members of the New York Sub-Class for damages in an amount to be proven at trial.

## COUNT XXII

### North Carolina Unfair and Deceptive Trade Practices Act
### (N.C. Gen. Stat. §75.1-1)
### (On Behalf of the North Carolina Sub-Class)

664.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

665.    This claim is brought by Plaintiffs Lorenzo Macaisa and Sheila Cauthen on their own behalf and on behalf of the North Carolina Sub-Class Class.

666.    North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1-1 ("UDTPA") prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

667.    Defendant's business acts and practices alleged herein violate the UDTPA.

668.    The purchase or lease of the Vehicles by Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members as described herein constitute transactions in commerce within the meaning of UDTPA.

669.    General Motors violated the UDTPA by concealing and failing to disclose the CUE Defects. General Motors had an ongoing duty to Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members to refrain from unfair and deceptive practices under the UDTPA in the course of its business.

670.    The practices of Defendant violate the UDTPA for, inter alia, one or more of the following reasons:

(a) Defendant represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

(b) Defendant provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the Vehicles;

(c) Defendant represented that goods or services were of a particular standard, quality, or grade, when they were of another;

(d) Defendant engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members about facts that could not reasonably be known by the consumer;

(e) Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

(f) Defendant caused Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

(g) Defendant purported to disclaim or limit the implied warranty of merchantability without providing such disclaimer or limitation in a clear, truthful and conspicuous manner;

(h) Defendant failed to reveal material facts to Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the North Carolina Sub-Class members;

(i) Defendant made material representations and statements of fact to Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members that resulted in them reasonably believing the represented or suggested state of affairs to be other than what they actually were;

(j) Defendant intended that Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members rely on their misrepresentations and omissions, so that they would purchase the Vehicles; and

(k) Under all of these circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and

outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

671.    The conduct of Defendant was likely to mislead consumers and Defendant intended that Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members rely on their misrepresentations.

672.    The conduct of Defendant offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

673.    The foregoing acts, omissions and practices proximately caused Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members to suffer an ascertainable loss in the form of, inter alia, overpayment and diminution in value of the Vehicles, and Plaintiffs Macaisa and Cauthen and the North Carolina Sub-Class members are entitled to recover such damages, together with appropriate exemplary damages, attorneys' fees and costs of suit.

674.    Plaintiffs Macaisa and Cauthen further seek an order enjoining Defendant's unfair or deceptive acts or practices.

## COUNT XXIII

### Breach of Implied Warranty of Merchantability (North Carolina)
### (N.C. Gen. Stat. § 25-2-314)
### (On Behalf of the North Carolina Sub-Class)

675.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

676.    Plaintiffs Macasia and Cauthen bring this Count on behalf of the North Carolina Sub-Class.

677.    General Motors is and was at all relevant times a merchant with respect to motor vehicles.

678.    A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

139

679. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' CUEs rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

680. General Motors was provided notice of these issues by numerous complaints filed against it, including the Complaint and the instant First Amended Complaint, and by numerous individual complaints and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after General Motors issued the TSBs and the allegations of Class Vehicle defects became public.

681. As a direct and proximate result of General Motors' breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT XXIV

**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of the Texas Sub-Class)**

682. Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

683. Plaintiffs Kendra Piazza and Gini Michelle Cox (collectively, the "Texas Plaintiffs") bring this cause of action on their own behalf and on behalf of the members of the Texas Sub-Class.

684. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

685. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

140

686.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

687.    GM provided all purchasers and lessees of the Class Vehicles with the express Warranty described herein, which became a material part of the bargain.

688.    Under the Warranty, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 4 years or 50,000 miles, whichever comes first, for the Class Vehicles.

689.    GM manufactured and/or installed the CUE Systems and the CUE Systems' component parts in the Class Vehicles, and the CUE Systems and their component parts are covered by the express Warranty.

690.    The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to the Texas Plaintiffs and the Texas Sub-Class Members.

691.    Plaintiffs relied on GM's express Warranty, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

692.    Under the express Warranty, GM was obligated to correct the Defect in the vehicles owned or leased by the Texas Plaintiffs and the Texas Sub-Class Members.

693.    Although GM was obligated to correct the Defect, none of the attempted fixes to the CUE Systems are adequate under the terms of the Warranty, as they did not cure the Defect.

694.    GM breached the express Warranty by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranty, GM falsely informed the Texas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures

including software updates, and/or replaced defective components in the CUE Systems with equally defective components, without actually repairing the Class Vehicles.

695.    GM and its agent dealers have failed and refused to conform the CUE Systems to the express Warranty. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

696.    Moreover, GM's attempt to disclaim or limit the express Warranty vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the Defect.

697.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Sub-Class Members. Among other things, the Texas Plaintiffs and the Texas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members, and GM knew or should have known that the Class Vehicles were defective at the time of sale.

698.    The Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the Warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

699.    The Texas Plaintiffs and the Texas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal and external sources.

700.    Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Defect if GM determines the repairs are appropriately covered under the Warranty, GM cannot now deny that the Warranty covers the Defect.

701.    Because GM has not been able remedy the Defect, any limitation on remedies included in the Warranty causes the Warranty to fail its essential purpose, rendering it null and void.

702.    As a direct and proximate cause of GM's breach, the Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, the Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

703.    As a direct and proximate result of GM's breach of express Warranty, the Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be determined at trial.

## COUNT XXV

**Breach of the Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas Sub-Class)**

704.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

705.    The Texas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Texas Sub-Class.

706.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

707.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

708.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

709.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

710.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the CUE Systems to customers through authorized dealers, like those from whom the Texas Plaintiffs and the Texas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to the Texas Plaintiffs and the Texas Sub-Class Members, with no modification to the defective CUE Systems.

711.    GM provided the Texas Plaintiffs and Texas Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

712.    This implied warranty included, among other things:  (i) a warranty that the Class Vehicles and their CUE Systems were manufactured, supplied, distributed, and/or sold by GM were luxury, safe, and reliable vehicles for providing transportation; and (ii) a warranty that the Class Vehicles and their CUE Systems would be fit for their intended use while the Class Vehicles were being operated.

713.    Contrary to the applicable implied warranties, the Class Vehicles and their CUE Systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing the Texas Plaintiffs and Texas Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their CUE Systems and the existence of the Defect at the time of sale or lease and thereafter. GM knew of this Defect at the time these sale or lease transactions occurred.

714.    As a result of GM's breach of the applicable implied warranties, the Texas Plaintiffs and the Texas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, the Texas

Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' CUE System components are substantially certain to fail before their expected useful life has run.

715.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

716.    The Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

717.    The Texas Plaintiffs and the Texas Sub-Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the CUE Systems or components thereof, and through other internal sources.

718.    As a direct and proximate cause of GM's breach, the Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, the Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

719.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, the Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be proven at trial.

**COUNT XXVI**

**Violation of Texas Deceptive Trade Practices Act
(Tex. Bus. & Com. Code Section 17.46 *et seq.*)
(On Behalf of the Texas Sub-Class)**

720.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

721.    The Texas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Texas DTPA Sub-Class.

722.    The Texas Plaintiffs, on behalf of themselves and the Texas DTPA Sub-Class, reallege as if fully set forth herein each and every allegation set forth above.

723.    The Texas Plaintiffs and each member of the Texas DTPA Sub-class is a "consumer" as defined in the Texas Deceptive Trade Practices Act ("DTPA").

724.    Defendant violated the following provisions of the DTPA:

(a) Tex. Bus. & Com. Code §17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in §17.46(b)(5), §17.46(b)(7), §17.46(b)(12), §17.46(b)(20), and §17.46(b)(24) of the DTPA that were detrimentally relied upon by Plaintiffs and each member of the Texas Subclass;

(b) Tex. Bus. & Com. Code §17.50(2): breach of express warranty, as defined in §2.313 of the Tex. Bus. & Com. Code;

(c) Tex. Bus. & Com. Code §17.50(2): breach of the implied warranty to perform repairs in a good and workmanlike manner, as set forth in *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 354 (Tex. 1987);

(d) Tex. Bus. & Com. Code §17.50(2): breach of the implied warranty of merchantability as defined in §2.314 of the Tex. Bus. & Com. Code; and

(e) Tex. Bus. & Com. Code §17.50(3): an unconscionable action or course of action as defined by §17.45(5).

146

725.    The limited remedies in Defendant's warranties failed of their essential purpose and deprived the Texas Plaintiffs and each member of the Texas DTPA Sub-Class of the substantial value of the bargain because Defendant did not correct the Defect within a reasonable time. Tex. Bus. & Com. Code §2.719.

726.    Defendant's violations of the DTPA were committed knowingly and intentionally as those terms are defined in §17.45(9) and §17.45(13) of the DTPA.

727.    Defendant's conduct was a producing and/or proximate cause of actual damages to the Texas Plaintiffs and each member of the Texas DTPA Sub-Class.

## COUNT XXVII

### Violation of the West Virginia Consumer Credit and Protection Act
### (W.Va. Code §§ 46A-1-101, *et seq.*)
### (On Behalf of the West Virginia Sub-Class)

728.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

729.    Plaintiff David Conroe brings this count on his own behalf and on behalf of the West Virginia Sub-Class.

730.    General Motors is a "person" under W. Va. Code § 46A-1-102(31).

731.    Plaintiff Conroe and the West Virginia Sub-Class are "consumers," as defined by W. Va. Code §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Class Vehicles with the Defective CUEs installed in them.

732.    Defendant engaged in trade or commerce as defined by W. Va. Code § 46A-6 102(6).

733.    The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: (I) Advertising goods or services with intent not to sell them as advertised; (K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price

reductions; (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive. W. Va. Code § 46A-6-102(7).

734.    In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the CUEs installed in them.

735.    By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the Defective CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the West Virginia CCPA. Defendant deliberately withheld the information about the propensity of the CUEs to fail, in order to ensure that consumers would purchase the Class Vehicles.

736.    In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above.

148

Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

737. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

738. Defendant's intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective CUEs installed in them with an intent to mislead Plaintiff and the West Virginia Sub-Class.

739. Defendant knew or should have known that its conduct violated the West Virginia CCPA.

740. As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them that were either false or misleading.

741. To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

742. Defendant owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective CUE installed in them because Defendant:

743. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

744. intentionally concealed the foregoing from Plaintiff; and/or

745.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

746.    Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the Defective CUE installed in them the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

747.    Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective CUEs in Class Vehicles were material to Plaintiff and the West Virginia Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

748.    Plaintiff and the West Virginia Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles and/or the Defective CUEs installed in them, and Defendant's complete disregard for safety, Plaintiff either would have paid less for the vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of Defendant's misconduct.

749.    Defendant's violations present a continuing risk to Plaintiff, the West Virginia Sub-Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

750.    Pursuant to W. Va. Code § 46A-1-106, Plaintiffs seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff and each member of the West Virginia Sub-Class they seek to represent.

751.    Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful

and conscious disregard of the rights and safety of others, subjecting Plaintiff and the West Virginia Sub-Class to cruel and unjust hardship as a result. Defendant's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them, deceived Plaintiff and the West Virginia Sub-Class and concealed material facts that only Defendant knew, all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles and/or the Defective CUE installed in them. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages. Plaintiff further seek an order enjoining Defendant's unfair or deceptive acts or practices.

## COUNT XXVIII

### Breach of the Implied Warranty of Merchantability (West Virginia)
### (W.Va. Code § 46-2-314)
### (On Behalf of the West Virginia Sub-Class)

752.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

753.    Plaintiff Conroe brings this count on his behalf and on behalf of the West Virginia Sub-Class.

754.    General Motors is and was at all relevant times a merchant with respect to motor vehicles and/or CUEs within the meaning of W. Va. Code § 46A-6-107 and § 46-2-314.

755.    A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to W. Va. Code § 46-2-314.

756.    The Class Vehicles and/or the defective CUEs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and infotainment systems are used.

757.    Defendant was provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers.

758.    As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff Conroe and the West Virginia Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXIX

### Fraudulent Concealment
### (On Behalf of each of the State Sub-Classes)

759.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

760.    Plaintiffs bring this Count on their own behalf and on behalf of their respective Statewide Sub-Classes.

761.    As set forth above, General Motors concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of their Class Vehicles. General Motors had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as safe and proclaimed that safety is one of General Motors's highest corporate priorities. Once General Motors made representations to the public about safety, quality, functionality, and reliability, General Motors was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

762.    In addition, General Motors had a duty to disclose these omitted material facts because they were known and/or accessible only to General Motors which has superior knowledge and access to the facts, and General Motors knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

763.    Whether or not the vehicle's climate systems work; whether the rearview camera monitor is working and visible in the CUE display and is otherwise in working condition; and the

other functions that fail as a result of the defect alleged herein, are material safety concerns. General Motors possessed exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

764.    General Motors actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the other Class members to purchase or lease Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

765.    General Motors still has not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class members.

766.    Plaintiffs and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the other Class members' actions were justified. General Motors was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

767.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage.

768.    General Motors' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights and well-being to enrich General Motors. General Motors' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XXX

### Unjust Enrichment
### (On Behalf of the Nationwide Class or Alternatively, each of the State Sub-Classes)

769.    Plaintiffs incorporate by reference and re-allege the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

770.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

771.    As a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects, Defendant has profited through the sale and lease of said vehicles. Although these vehicles are purchased through Defendant's agents, the money from the vehicle sales flows directly back to Defendant.

772.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendant charged a higher price for their vehicles than the vehicles' true value. Plaintiffs and Members of the Class paid that higher price for their vehicles to Defendant's authorized dealers, which are in Defendant's control. Defendant also reaps huge profits from the sales of its vehicles through its authorized dealers, netting $113,792,000 in 2018 alone.

773.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects and material misrepresentations regarding known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

774.    Defendant has therefore been unjustly enriched due to the known defects in the Class Vehicles through the use of funds that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

775.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court to enter judgment against GM, as follows:

A. An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class and their representative Sub-Classes, and designating the undersigned as Class Counsel;

B. A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the CUE Systems, including the need for period maintenance;

C. An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, and to remove and replace Plaintiffs and Class Members' CUE Systems with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement CUE System that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class members that such warranty has been reformed;

D. A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

E. An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

F. Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

G. Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged;

H. A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiffs and Class Members;

I. An award of attorneys' fees and costs, as allowed by law;

J. An award of pre-judgment and post-judgment interest, as provided by law;

K.  Leave to amend the Complaint to conform to the evidence produced at trial;

L.  Plaintiffs demand that GM perform a recall, and repair all vehicles; and

M.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated:  May 15, 2020                    Respectfully submitted,


                                        /s/ *Russell D. Paul*
                                        Russell D. Paul (Bar No. 4647)
                                        Amey J. Park (*PHV application forthcoming*)
                                        BERGER MONTAGUE PC
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        Tel.:    (215) 875-3000
                                        Fax:    (215) 875-4604
                                        Email:  rpaul@bm.net
                                                apark@bm.net

                                        Steven    R.    Weinmann    (*PHV    application
                                        forthcoming*)
                                        Tarek H. Zohdy (*PHV application forthcoming*)
                                        Cody R. Padgett *PHV application forthcoming*)
                                        Trisha K. Monesi (*PHV application forthcoming*)
                                        CAPSTONE LAW APC
                                        1875 Century Park East, Suite 1000
                                        Los Angeles, California 90067
                                        Tel.:    (310) 556-4811
                                        Fax:    (310) 943-0396
                                        Email:  Steven.Weinmann@capstonelawyers.com
                                        Tarek.Zohdy@capstonelawyers.com
                                        Cody.Padgett@capstonelawyers.com
                                        Trisha.Monesi@capstonelawyers.com

                                        CASEY    GERRY    SCHENK    FRANCAVILLA
                                        BLATT & PENFIELD, LLP
                                        Gayle M. Blatt (*PHV application forthcoming*)
                                        gmb@cglaw.com
                                        Jeremy Robinson (*PHV application forthcoming*)
                                        jrobinson@cglaw.com
                                        P. Camille Guerra (*PHV application forthcoming*)

156

camille@cglaw.com
James M. Davis (*PHV application forthcoming*)
jdavis@cglaw.com
110 Laurel Street
San Diego, CA 92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

MOON LAW APC
Christopher    D.    Moon    (*PHV    application
forthcoming*)
chris@moonlawapc.com
Kevin O. Moon (*PHV application forthcoming*)
kevin@moonlawapc.com
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 618-0478

POULOS LOPICCOLO PC
Joseph LoPiccolo (*PHV application forthcoming*)
John N. Poulos(*PHV application forthcoming*)
1305 South Roller Road
Ocean, NJ 07712
732-757-0165
lopiccolo@pllawfirm.com
poulos@pllawfirm.com

LITE DEPALMA GREENBERG, LLC
Bruce D. Greenberg (*PHV application forthcoming*)
570 Broad Street, Suite 1201
Newark, New Jersey 07102
973-623-3000
bgreenberg@litedepalma.com

STULL, STULL & BRODY
Melissa R. Emert (*PHV application forthcoming*)
6 East 45th Street
New York, NY  10017
Tel:      (212) 687-7230
Fax:      (212) 490-2022
Email:  memert@ssbny.com

KANTROWITZ GOLDHAMER &
GRAIFMAN, P.C.
Gary S. Graifman (*PHV application forthcoming*)

747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Tel:    (845) 356-2570
Fax:    (845) 356-4335
Email: ggraifman@kgglaw.com

LEVI & KORSINSKY, LLP
Rosemary M. Rivas (*PHV application forthcoming*)
Email: rrivas@zlk.com
Rosanne L. Mah (*PHV application forthcoming*)
Email: rmah@zlk.com
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Counsel for Plaintiffs and the Class*